[No. B194272. Second Dist., Div. Eight. Oct. 19, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
MANUEL BANOS, Defendant and Appellant.

COUNSEL

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Stephanie C. Brenan and Jason Tran, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**RUBIN, Acting P. J.—**

## INTRODUCTION

In 2006, a jury convicted defendant Manuel Banos of the second degree murder of his ex-girlfriend, Mary Ann Cortez, and two counts of first degree burglary. On appeal, defendant challenges on Sixth Amendment grounds the admission into evidence of certain of Cortez's out-of-court statements to police during prior domestic violence investigations. In an earlier opinion, we affirmed the judgment after upholding the admission of those statements under the forfeiture by wrongdoing exception to the confrontation clause as articulated by our Supreme Court in *People v. Giles* (2007) 40 Cal.4th 833 [55 Cal.Rptr.3d 133, 152 P.3d 433], certiorari granted *sub nom. Giles v. California* (2008) 552 U.S. 1136 [169 L.Ed.2d 800, 128 S.Ct. 976] (*Giles I*). Under that doctrine, a defendant may forfeit the right to confront a witness when he has killed that witness or otherwise made the witness unavailable at trial. (*People v. Banos* (Jan. 29, 2008, B194272) [nonpub. opn.].) The United States Supreme Court vacated our judgment and transferred the case back to us for reconsideration in light of its decision in *Giles v. California* (2008) 554 U.S. ___ [171 L.Ed.2d 488, 128 S.Ct. 2678] (*Giles II*). In *Giles II*, the court concluded that the forfeiture by wrongdoing exception applies only upon a showing that the defendant killed the witness *for the purpose of* making him or her unavailable as a witness at trial.

■ We have now considered defendant's appeal in light of *Giles II* and again affirm the judgment. Certain of Cortez's statements are not testimonial and are admissible under *Crawford v. Washington* (2004) 541 U.S. 36, 53–54 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*) and *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*). The balance is admissible under the forfeiture by wrongdoing exception, as formulated in *Giles II*: there was substantial evidence that defendant killed Cortez to prevent her from reporting his prior conduct to police and from testifying against him. That defendant may have also had other motives for the killing (e.g., retribution for infidelity) does not preclude application of the exception.

## FACTUAL AND PROCEDURAL BACKGROUND

We recite the evidence in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357–358 [75 Cal.Rptr.3d 289, 181 P.3d 105]). Much of the evidence was unchallenged, including testimony that victim Cortez's complaints to police had resulted in defendant's arrest three times in the 10 months before Cortez was killed. Because of the significance of these arrests on the issue remanded to us, we start our factual summary with events prior to the Cortez killing.

*A. Prior Arrests of Defendant for Domestic Violence*

*1. June 7, 2003*

When Burbank Police Officer Mark Armendariz responded to Cortez's apartment around 10:45 p.m., on June 7, 2003, Cortez was "excited" and "upset." Armendariz and Cortez spoke about defendant's physical assault on her earlier that day. Armendariz left to see if defendant was still in the vicinity, did not find him and then resumed other duties.

Minutes after Officer Armendariz left, Cortez again called 911. The admission into evidence of the recording of that telephone call is not challenged on appeal.[1] Although the telephone call was to 911, most of the recorded material was an exchange between Cortez and defendant:

"CORTEZ: I'm in trouble.

"[DEFENDANT]: Do you want to speak to the police?

"CORTEZ: No.

---

[1] Defendant claims the trial court erred by admitting a much later 911 call, one on March 27, 2004. (See Discussion, pts. A–C, *post*.)

"[DEFENDANT]: Are you going to talk?

"CORTEZ: Yes. [¶] . . . [¶]

"CORTEZ: Why are you hitting me?

"[DEFENDANT]: I am going to kill you. (Unintelligible.)

"CORTEZ: What do you want, Manuel?

"[DEFENDANT]: Sit back.

"CORTEZ: I didn't call anybody.

"[DEFENDANT]: (Unintelligible.)

"CORTEZ: Manuel, my phone don't reach. Manuel (Unintelligible.) Leave me alone. I just want to sit down. (Screams.) (Cries.)

"[DEFENDANT]: (Unintelligible.) I'll kill you, true to God. (Unintelligible.)

"CORTEZ: (Cries.)

"[DEFENDANT]: Are you going to speak to the cops? Are you going to speak?

"CORTEZ: (Unintelligible.)

"[DEFENDANT]: Are you going to shut up or am I going to kill you?

"CORTEZ: Uh-huh.

"[DEFENDANT]: Are you going to shut up or am I going to kill you? I am going to kill you. Are you going to shut up? Are you going to shut up?

"CORTEZ: Hum.

"[DEFENDANT]: Um?

"CORTEZ: Uh-huh.

"[DEFENDANT]: Are you going to shut up?

"CORTEZ: (Unintelligible.)

"[DEFENDANT]: What?

"CORTEZ: Yeah.

"[DEFENDANT]: I am going to kill you. (Unintelligible.)"

The sound of Officer Armendariz entering the apartment a second time then can be heard on the tape.

Officer Armendariz testified that, about 10 minutes after first leaving Cortez, he was dispatched back to her apartment "code three," which means with lights and siren activated. When Armendariz arrived back at the apartment, defendant was sitting on the couch next to Cortez. Defendant was arrested. On July 23, 2003, a protective order was issued which restrained defendant from annoying, harassing, striking, threatening or disturbing Cortez for a period of three years.

### 2. December 30, 2003

Some six months later, Officer Armendariz and his partner, Officer Mark Neufeld, were dispatched to Cortez's apartment to investigate a possible violation of the restraining order. When they arrived, Neufeld saw defendant walking out of Cortez's apartment. Defendant told Neufeld that he had arrived about an hour earlier; defendant said he was aware of the restraining order but wanted to reunite with Cortez. The officers also spoke to Cortez, whom Neufeld described as "frightened, very nervous." Defendant was arrested a second time.

### 3. March 27, 2004

Three months later, Burbank Police Officer Fernando Rojas was dispatched to a 7-Eleven in response to a 911 call regarding violation of a restraining order. At the 7-Eleven, Rojas spoke to Cortez. After verifying the existence of the court order, Rojas went to Cortez's apartment where he found defendant inside. Defendant was arrested a third time.

A hearing on defendant's alleged violation of the July 23, 2003 protective order was scheduled for April 19, 2004.

### B. The Killing

By April 2004, Cortez had begun dating defendant's friend, Javier Garcia. On April 10, 2004, nine days before the scheduled hearing on the restraining

order violation, Garcia and Cortez spent the evening together before returning to Cortez's apartment. Defendant made three phone calls to the apartment around 3:00 a.m. Each time, Garcia answered the phone. On the first two occasions, Garcia simply hung up; the third time, Garcia gave the phone to Cortez. When Cortez handed the phone back to Garcia, she told him that defendant had threatened to kill her. A short while later, Cortez heard noises outside. Garcia looked out the window and saw someone trying to peek in. Garcia told Cortez to call the police. As defendant came in through the window, Garcia ran into the kitchen and armed himself with a knife and a knife sharpener but got scared and ran out of the apartment. As he was leaving, Garcia saw defendant running toward Cortez with his right arm raised. He was on the next street when he heard Cortez calling his name and screaming for help.

Cortez was still alive about 4:00 a.m., when Burbank Police Officer Edmundo Zepeda and his partner heard the moaning sounds of a woman from Cortez's apartment. Through the open front door, Zepeda saw defendant, whom he recognized from a prior arrest, wearing black gloves and kneeling beside a female body. Still standing outside the front door, Zepeda identified himself as a police officer. Defendant stood up, said "my wife" a few times and walked toward Zepeda. When he reached the front door, defendant slammed it shut. As Zepeda tried to kick the door open, he heard someone running toward the back of the apartment. As he ran down the walkway between buildings in pursuit, Zepeda heard the back door slam. Arriving at the back of the building, Zepeda did not see defendant, but heard rustling in the bushes. Because there was a victim inside the apartment, Zepeda abandoned the search for defendant and returned to the residence.

Back inside the apartment, Officer Zepeda found Cortez lying on the floor covered in blood. He asked her where she was hurt, but Cortez's response was incoherent. Zepeda accompanied her in an ambulance to the hospital while his partner remained at the apartment to preserve the scene.

Defendant was apprehended later that morning and transported to the vicinity of Cortez's apartment where he was left alone in the back of a patrol car with a friend. Unbeknownst to the two men, their conversation was recorded. The recording was introduced into evidence; on it defendant is heard saying to his friend: "I got even with that whore, like I wanted to. I'm very happy." Defendant said he used a hammer to "smash[] her . . . so she'll learn, that fucking whore." When interviewed by the police, defendant

admitted threatening Cortez, climbing through the bedroom window and hitting Cortez with a piece of wood.

## C. *Defense Case*

Defendant testified that he moved in with Cortez in late 2001. She practiced witchcraft, and defendant believed she had the power to cast spells. Six months after moving in with her, defendant began having headaches, which he believed Cortez was causing. Even after Cortez caused him to be arrested several times, defendant reunited with her because he was bewitched and completely under her control.

Defendant was once again living with Cortez on April 10, 2004, when he called and told her that he would be spending the night with his sister because it was closer to work. But he got drunk and decided to go back to Cortez's apartment about 2:00 a.m. He did not then know that she was with Garcia, and he did not intend to kill her.

Arriving at Cortez's apartment in the early morning hours of April 11, 2004, defendant used his own key to open the front door. In the bedroom, defendant found Cortez and Garcia in bed together. Defendant recalled: "I was drunk and I was angry and I took out my hammer. And he ran through the window just wearing his underwear. I wanted to grab him but I couldn't. And then I wanted to run out through the door but [Cortez] didn't want to let me. She was in the living room and she tried to stop me." After hitting Cortez in the head with the hammer, defendant "lost my mind. I hit her like three times that I can remember. . . . I started to go crazy. I—I wanted to help her. I started to hold her and there was blood everywhere. And I was trying sort of to help her. That's why there was blood everywhere."

Defendant next went out of the front door and threw the hammer in one trash bin and his sweatshirt in a neighbor's trash bin. Returning to the apartment, he replaced his bloody shorts with a pair of Garcia's pants and then went outside again to throw the bloody shorts across the street. When the police came, defendant slammed the front door and ran out the back.

## D. *Conviction and Sentence*

Defendant was charged with first degree murder and burglary. After the jury was unable to agree on the degree of the murder, the prosecutor withdrew the first degree allegation. The jury found defendant guilty of second degree murder and burglary and found true two deadly/dangerous

weapon enhancements. Defendant admitted prior convictions. He was sentenced to 36 years to life in prison.

## DISCUSSION

A. *Summary of Relevant Trial Court Proceedings on Cortez's Out-of-court Statements*

At trial, the People sought to introduce statements Cortez made to police on the three occasions they had arrested defendant, as well as the recording of the 911 call Cortez made on March 27, 2004. In a pretrial motion, the People asserted that Cortez's out-of-court statements were admissible because they fell within the confrontation clause exception for forfeiture by wrongdoing. The prosecutor argued defendant killed Cortez on April 11, 2004, and thus prevented her from appearing in court and "testifying to the prior acts of domestic violence." Over defendant's objections founded primarily on *Crawford, supra,* 541 U.S. at pages 53–54, the trial court granted the People's motion, thus paving the way for the admission of the following evidence about what Cortez told the officers. It is this evidence that defendant now challenges.

—**June 7, 2003 (I)**: Officer Armendariz testified that during his first meeting with Cortez at her apartment on June 7, 2003, Cortez told him that earlier that day she and defendant were at a laundromat when they started arguing about their relationship. After defendant hit Cortez, she called a cab to leave, but defendant followed Cortez into the taxi and continued assaulting her. When Cortez tried to call 911 in the cab, defendant took her cell phone and punched her in the face several times. Defendant eventually got out of the cab, and Cortez went home. Cortez called 911 again, this time reaching dispatch. Before police arrived defendant telephoned her and said, "I'm going to get even with you. When you are asleep I'm going to come over and kill you and split to Mexico." When Armendariz spoke to her the first time in her apartment, Cortez told him of the phone call and that she was afraid defendant might come back and hurt her. Cortez told Armendariz that she intended to find somewhere else to stay.

—**June 7, 2003 (II)**: Some time later that evening following Cortez's third 911 call, Officer Armendariz returned to Cortez's apartment. Cortez told him that defendant had broken into her apartment after Armendariz had left and that defendant had hit her in the face with his fist three or four times, choked her, and threatened to kill her. Cortez told Officer Armendariz that defendant said, "I'm going to kill you. I heard everything that you said to the police" and "[f]or telling the police, now you are going to get it." When Cortez called

911, defendant pulled the telephone away and continued the assault. (The third 911 call is the one that we set out verbatim, *ante*.)

—**December 30, 2003**: Officer Neufeld testified that on December 30, 2003, Cortez told him that as of October she and defendant had been seeing each other only "off and on." Defendant wanted to reunite but Cortez refused because of defendant's past violence toward her. Defendant had spent the prior night with Cortez; when she asked defendant to leave, he refused and, when Cortez threatened to call the police if he did not leave, defendant said he would kill her if she called the police. Cortez did not telephone the police because she "was concerned for her safety if she got the police involved because she genuinely believed that he could take her life." Cortez told Neufeld that she "was genuinely concerned for her safety and believed that [defendant] was capable of committing harm to her." Neufeld advised Cortez to stay with friends or relatives until things calmed down, but Cortez said there was no one to stay with her and nowhere for her to go.

—**March 27, 2004 (I)**: Officer Rojas testified that on March 27, 2004, Cortez called 911. In response to questions from the 911 dispatcher, Cortez identified herself and stated that she had a "restraining order on a guy named Manuel Banos. And he's in my apartment, and I don't want him there because I fear that he's, you know, going to attack me . . . ." Cortez explained: "I'm calling from a phone booth 'cause I don't want to go there to take a chance because he's dangerous, it was attempted murder case. [¶] He—he got arrested about two or three months ago and then he's—and then—and now he's—he's supposed to be—he's not supposed to be near me. I have a—the restraining order says a hundred—within a hundred yards."

—**March 27, 2004 (II)**: Officer Rojas testified that when he met Cortez at the 7-Eleven in response to her 911 call, she told him that she was afraid to go home because her ex-boyfriend had arrived uninvited and was still there.

B.  *Defendant's Contention on Appeal*

Defendant's sole contention on appeal is that under *Crawford* and *Davis*, he was denied his Sixth Amendment right to confront and cross-examine Cortez as a result of the admission of Cortez's out-of-court, testimonial statements. The People counter that the challenged statements were (1) not testimonial because they were made to police officers investigating an

ongoing emergency; (2) even if the statements were testimonial, they fell within the forfeiture by wrongdoing exception to the confrontation clause.[2]

As we shall explain, the statements Cortez made during her March 27, 2004 call to 911 and in her subsequent conversation with Officer Rojas on that day were not testimonial; therefore admission of those statements did not violate defendant's confrontation rights under *Crawford* and *Davis*. We hold that Cortez's statements to Officer Armendariz on June 7, 2003, and to Officer Neufeld on December 30, 2003, were testimonial. Nevertheless, we conclude the statements were admissible under the forfeiture by wrongdoing exception to the confrontation clause under the test articulated by the United States Supreme Court in *Giles II*: there is substantial evidence that defendant killed Cortez to prevent her from reporting him to the police and from testifying against him at the scheduled hearing on the restraining order violation.

C. *The March 27, 2004 Call to 911 and the Statement to Officer Rojas Were Not Testimonial*

On March 27, 2004, Cortez made a 911 call and also spoke in person to Officer Rojas. Defendant contends the statements were testimonial and not subject to the forfeiture by wrongdoing exception. We conclude the evidence was not testimonial and therefore do not need to discuss the forfeiture point for this evidence.

---

[2] The People also argue that the statements are admissible under Evidence Code section 1240 (section 1240). We do not need to address whether the evidence is admissible as Cortez's "spontaneous statements" because defendant does not argue on appeal that the testimony was hearsay under state law.

At the hearing on the prosecution's motion to allow testimony about defendant's prior acts of domestic violence against Cortez, the parties made several arguments not maintained on appeal. The trial court apparently found that the prior domestic violence evidence was admissible under Evidence Code section 1109 (evidence of prior acts of domestic violence admissible under certain circumstances). The court also rejected the defense argument that, aside from the confrontation clause violation, Cortez's out-of-court statements to police officers were hearsay under state law. The court held that evidence qualified as spontaneous statements under section 1240. Defendant also asserted an Evidence Code section 352 objection. The parties did not address Evidence Code section 1350, which codifies as a hearsay exception some aspects of the common law forfeiture by wrongdoing rule. (See fn. 8, *post*.)

Because none of these points is raised on appeal we do not address them, other than to observe there is some overlap between the spontaneous statement hearsay exception under section 1240 and the nontestimonial nature of spontaneous statements under *Crawford* and *Davis*. (See *People v. Pedroza* (2007) 147 Cal.App.4th 784, 792–794 [54 Cal.Rptr.3d 636] [" 'difficult to identify any circumstances' " under which a spontaneous statement would be testimonial]; *People v. Corella* (2004) 122 Cal.App.4th 461, 469 [18 Cal.Rptr.3d 770].)

### 1. *Legal Principles*

■    The confrontation clause of the Sixth Amendment to the United States Constitution bars the admission of out-of-court testimonial statements except when both the witness is unavailable *and* the defendant had a prior opportunity to cross-examine the witness. (*Crawford, supra,* 541 U.S. at pp. 61–68.) In *Davis, supra,* 547 U.S. at page 817, the court clarified what is meant by testimonial statements. It explained: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis,* at p. 822, fn. omitted; see *People v. Byron* (2009) 170 Cal.App.4th 657, 668 [88 Cal.Rptr.3d 386].)[3]

*Davis* consolidated two domestic violence convictions: *Davis v. Washington* and *Hammon v. Indiana.* In the *Davis v. Washington* conviction, the defendant was charged with violation of a domestic no-contact order, and the state's only witnesses were the investigating officers. The victim, Michelle McCottry, did not appear. (*Davis, supra,* 547 U.S. at p. 818.) At issue was the admissibility of a recording of McCottry's call to 911. The court's opinion sets out the 911 call. It is apparent from the recording that McCottry was in the process of being attacked; she identified the defendant as her assailant; in response to a question from the 911 operator, McCottry stated, " 'He's here jumpin' on me again' "; and when the operator asked if there were any weapons, McCottry responded, " 'No. He's usin' his fists.' " (*Id.* at p. 817.) The court in *Davis* concluded that the circumstances of the questioning by the 911 dispatcher "objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. [McCottry] simply was not acting as a *witness*; she was not *testifying.* What she said was not 'a weaker substitute for live testimony' at trial . . . ." (*Id.* at p. 828.) The court noted that the emergency ended during the call when the defendant left the scene and "from that point on, McCottry's statements were testimonial . . . ," but the only issue on appeal was the admissibility of McCottry's statement identifying the defendant as her attacker during the nontestimonial portion of the call. (*Id.* at pp. 828–829.)

In the *Hammon v. Indiana* part of the opinion, the defendant was charged with domestic battery on his wife, Amy Hammon. (*Davis, supra,* 547 U.S. at

---

[3] The fact that a statement is not testimonial and therefore is admissible under *Crawford* does not mean it is necessarily admissible under applicable state evidentiary rules. (*Giles I, supra,* 40 Cal.4th at p. 854, overruled on other grounds in *Giles II, supra,* 554 U.S. ___ [128 S.Ct. 2678].) As we have pointed out, defendant does not claim any state law error.

p. 820.) Like McCottry, Hammon did not appear at trial. At issue was the admissibility of Hammon's statements to a police officer responding to a domestic disturbance call at the Hammon home: Hammon was alone on the front porch when two officers arrived; she appeared somewhat frightened, but told the officers " ' "nothing was the matter." ' " (*Id.* at p. 819.) Inside the house, the defendant told the officers he and Hammon had been arguing but it never became physical. While one officer remained with the defendant in the kitchen, the other spoke to Hammon in the living room. She told the officer that the defendant " 'broke the phone, broke the lamp, broke the front of the heater. When it became physical he threw her down into the glass of the heater. [¶] She informed me [the defendant] had pushed her onto the ground, had shoved her head into the broken glass of the heater and that he had punched her in the chest twice I believe.' " (*Id.* at pp. 820–821.) The Supreme Court concluded that "[t]here was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything [citation]. When the first officers arrived, Amy told them that things were fine [citation] and there was no immediate threat to her person. When the officer questioned Amy for the second time, and elicited the challenged statements, he was not seeking to determine (as in *Davis* [*v. Washington*]) 'what is happening,' but rather 'what happened.' Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer *should* have done." (*Id.* at pp. 829–830.) The court concluded Hammon's statements were inadmissible under *Crawford.*

In applying *Davis* to our case, we assess whether the circumstances here are more similar to McCottry's 911 call or to Hammon's statement to the investigating officers. In each of the cases urged by the People—*People v. Saracoglu* (2007) 152 Cal.App.4th 1584 [62 Cal.Rptr.3d 418] (*Saracoglu*), *People v. Johnson* (2007) 150 Cal.App.4th 1467 [59 Cal.Rptr.3d 405] (*Johnson*), and *People v. Chaney* (2007) 148 Cal.App.4th 772 [56 Cal.Rptr.3d 128] (*Chaney*)—the courts found the statements at issue closer to the McCottry call to 911 end of the continuum than to Hammon's statement to the police officers. Each appellate court found the statement nontestimonial and thus admissible. In *Chaney*, an officer serving a warrant encountered a "hysterical group of people who were wild and incomprehensible even after [the defendant] had fled. [The officer's] inquiry . . . was directed at determining what had happened, what *might* happen in the next few minutes, and the nature of the emergency involved. As such [the witness's] answers fell under the *Davis* definition of nontestimonial statements, as distinct from testimonial statements as defined in the companion case of *Hammon* [*v. Indiana*]. [Citations.]" (*Chaney*, at p. 780.)

In *Johnson*, the officer "heard the woman screaming as he stood at the door; the man who answered the door had blood on his hands; and the woman in the bathroom had a bloody, broken nose. That is the only information the officer had when he asked 'What happened?' " (*Johnson, supra*, 150 Cal.App.4th at p. 1479.) The officer's presence interrupted an ongoing altercation and the information obtained from the victim was to assess the emergency. Her statement to the officer was therefore not testimonial. (*Ibid.*)

In *Saracoglu*, the witness went to the police station after her husband choked her, pushed her, hit her and threatened to kill her if she called the police. The court in *Saracoglu* concluded that the officer was "[f]aced with an obviously distraught woman, who was crying, shaking and very afraid, [the officer's] primary purpose was to ascertain what was going on. In doing so, [he] elicited the information he needed to understand [the witness's] situation and to take action 'to *resolve* the present emergency.' [Citation.] These circumstances show the primary purpose of [the officer's] interrogation was not to 'establish or prove past events potentially relevant to a later criminal prosecution' [citation], but rather 'to enable police assistance to meet an ongoing emergency' [citation] . . . . [¶] [The witness's] account to [the officer] of having been assaulted and threatened by [the defendant] was nontestimonial within the meaning of *Davis*, and therefore its admission at [the defendant's] trial was not a confrontation clause violation." (*Saracoglu, supra*, 152 Cal.App.4th at p. 1598.)

Defendant relies on *People v. Cage* (2007) 40 Cal.4th 965 [56 Cal.Rptr.3d 789, 155 P.3d 205] (*Cage*), in support of his argument that Cortez's statements were testimonial. In *Cage*, the victim of an assault was in the hospital emergency room awaiting treatment for injuries he had sustained in the assault when he made statements to a police officer and a treating physician in response to each of them asking him what had happened. The trial court admitted into evidence the victim's statements to both the officer and the doctor. Our Supreme Court held that, under *Crawford* and *Davis* the statement to the doctor was nontestimonial and therefore admissible, but the statement to the officer was testimonial and inadmissible. As to the statement to police, the officer's "clear purpose in coming to speak with [the victim] at this juncture was not to deal with a *present emergency*, but to obtain a fresh account of *past events involving defendant* as part of an inquiry into possible criminal activity." (*Cage*, at p. 985.) By contrast, the victim's statement to the doctor was nontestimonial because the doctor's sole object in questioning the victim was how best to treat his injuries, not to establish past facts for possible criminal use. (*Id.* at p. 986.)

### 2. *Application of Law to Events of March 27, 2004*

We consider the March 27, 2004 call to 911 and the statement to Officer Rojas in light of the principles we have just discussed.

#### a. *The March 27, 2004 call to 911 was not testimonial.*

When Cortez called 911, she told the dispatch officer she was calling from a phone booth because defendant was at her apartment and she was afraid to return home. These circumstances are similar to those in *Saracoglu*, where the witness had left her assailant at home to seek the safety of the police station. As in *Saracoglu*, Cortez's primary purpose for making the statements to the 911 dispatch officer was to gain police protection. The statements were not yet the product of an interrogation, rather they were made to police conducting an investigation into an ongoing emergency. Accordingly, we conclude they were nontestimonial under *Davis*.[4]

#### b. *The subsequent statement to Officer Rojas was not testimonial.*

When Officer Rojas questioned Cortez at the telephone booth shortly after her call to 911, he was responding to an ongoing emergency. As with the officer in *Saracoglu*, Rojas's primary purpose in questioning Cortez was to ascertain what was happening in order to resolve a dangerous situation: defendant was at Cortez's apartment and she was afraid to go home. Cortez's statements to Rojas were nontestimonial.

We find no error in admitting testimony about the events on March 27, 2004.

### D. *The Two Statements to Officer Armendariz on June 7, 2003, and the Statement to Officer Neufeld on December 30, 2003, Were Testimonial*

#### 1. *The First Statement to Officer Armendariz*

When Cortez spoke to Officer Armendariz the first time on June 7, 2003, the attack that had started at the laundromat and continued inside the taxicab was over, defendant had left, and Cortez was in a place of ostensible safety—her home. Unlike victim McCottry in *Davis*, Cortez was not describing an ongoing assault when she made her first statement to Armendariz. And

---

[4] Calls made to 911 often present both testimonial and nontestimonial elements. (See Note, *The Price of Silence: The Prosecution of Domestic Violence Cases in Light of* Crawford v. Washington (2005) 79 So.Cal. L.Rev. 213, 264 & fn. 52 (*The Price of Silence*).)

unlike the officers in *Chaney* and *Johnson*, Armendariz did not interrupt an ongoing emergency. Like victim Hammon in *Davis* and the victim in *Cage*, Cortez was describing past criminal conduct—defendant's attack on her at the laundromat and in the cab. Armendariz spoke to Cortez not to determine what was then happening, but what had happened. (*Davis, supra*, 547 U.S. at p. 829.) Armendariz described Cortez as "excited" and "upset," but apparently not "distraught" like the witness in *Saracoglu*, a factor the court there relied upon to find the emergency was ongoing. Also in contrast to *Saracoglu*, defendant was not physically present with Cortez at her home; his whereabouts had not nullified a familiar place of safety for her.

### 2. *The Second Statement to Officer Armendariz*

Cortez's second statement to Officer Armendariz that same day has elements of both a formal interrogation and a response to an ongoing emergency. The statement came almost immediately after Armendariz had interrupted the attack in progress. But by the time of the police interview of Cortez, defendant was in custody and the ongoing emergency over. Unlike in *Chaney* and *Johnson*, Cortez's statements to Armendariz were not made in response to police efforts to resolve a present emergency. Cortez was describing past criminal conduct—defendant's break-in and attack. We conclude Cortez's second statement is most similar to the Supreme Court's description of victim McCottry's responses to the 911 officer's interrogation after McCottry's assailant had left: what began as an inquiry to determine the need for emergency assistance had evolved into a testimonial statement. (*Davis, supra*, 547 U.S. at pp. 828–829.)[5]

### 3. *The Statement to Officer Neufeld*

When Cortez spoke to Officer Neufeld on December 30, 2003, defendant had been detained by the police while leaving Cortez's apartment. There was no ongoing emergency. Like victim Hammon's statement to investigating officers and the latter part of victim McCottry's 911 call in *Davis*, Cortez was describing past criminal conduct—defendant's violation of the restraining order and threats to kill her. Cortez's statement to Neufeld was testimonial.

E.   *Under* Giles II, *Cortez's Testimonial Statements to Officers Armendariz and Neufeld Were Admissible Under the Forfeiture by Wrongdoing Exception*

Cortez's out-of-court statements to Officers Armendariz and Neufeld, as we have concluded, were testimonial. We next consider whether the statements

---

[5] It was the testimonial portion of Cortez's statement to which Officer Armendariz testified at trial.

are nevertheless admissible under the forfeiture by wrongdoing exception, as circumscribed by the United States Supreme Court in *Giles II*. Our analysis starts with a return visit to *Crawford* and rests with *Giles II*.

### 1. Crawford *to* Davis *to* Giles I

■ The United States Supreme Court in *Crawford* held that historic hearsay exceptions and judicial determinations of reliability do not necessarily satisfy a defendant's constitutional confrontation rights: "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."[6] (*Crawford, supra,* 541 U.S. at pp. 68–69.) But the court in *Crawford* renounced only those exceptions to the confrontation clause that purported to assess the reliability of testimony. ■ It expressly noted that the equitable principle of forfeiture by wrongdoing remained a valid exception to the confrontation clause: "For example, the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability. [Citation.]" (*Crawford, supra,* at p. 62.) To underscore the point, the court in *Davis* repeated: "We reiterate what we said in *Crawford*: that 'the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds.' [Citation.]" (*Davis, supra,* 547 U.S. at p. 833.)[7]

In *Giles I,* our Supreme Court placed an expansive gloss on *Crawford* and *Davis,* and held the forfeiture by wrongdoing exception applied whether or not the defendant specifically intended to prevent the witness from testifying at the time he committed the act that rendered the witness unavailable. (*Giles I, supra,* 40 Cal.4th at p. 849.) The court hearkened to the century-old forfeiture case of *Reynolds v. United States* (1878) 98 U.S. 145, 158–159 [25 L.Ed. 244] (*Reynolds*), a case that *Crawford, supra,* 541 U.S. at page 62 had cited favorably. (See *Giles I,* at p. 841.) Our Supreme Court wrote,

---

[6] Prior to *Giles II*, a criminal defendant's Sixth Amendment rights did not bar admission of an unavailable witness's statement if the statement bore "adequate 'indicia of reliability,' " which occurred when the evidence either fell within a firmly rooted hearsay exception or bore particular guarantees of trustworthiness. (*Ohio v. Roberts* (1980) 448 U.S. 56, 66 [65 L.Ed.2d 597, 100 S.Ct. 2531].)

[7] We have held that Evidence Code section 356 (whole statement admissible if part received) is also a rule founded not on reliability, but on fairness, and hearsay statements admitted under that statute are not subject to *Crawford*. (*People v. Parrish* (2007) 152 Cal.App.4th 263, 271–274 [60 Cal.Rptr.3d 868].)

"Notably, in describing the rule, the court did not suggest the rule's applicability hinged on Reynolds's purpose or motivation in committing the wrongful act."[8] (*Giles I*, at p. 842.) It was on this point the United States Supreme Court in *Giles II* disagreed. (*Giles II, supra*, 554 U.S. at pp. \_\_\_-\_\_\_ [128 S.Ct. at pp. 2687–2689].)

### 2. *Giles II*

In *Giles II*, the United States Supreme Court explained that forfeiture by wrongdoing was one of two common law doctrines that permitted unconfronted testimonial statements to be admitted into evidence. The other was dying declaration. (*Giles II, supra*, 554 U.S. at pp. \_\_\_-\_\_\_ [128 S.Ct. at pp. 2682–2683].) Historically, the doctrine was limited to deliberate witness tampering. (*Id.* at p. \_\_\_ [128 S.Ct. at p. 2687].) The court found the common law uniformly excluded out-of-court statements by murder victims where there was no showing that the defendant killed the victim for the *purpose* of preventing the victim's testimony. (*Id.* at p. \_\_\_ [128 S.Ct. at p. 2688].) The aim of the doctrine was to remove "the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them—in other words, it is grounded in 'the ability of the courts to protect the integrity of their proceedings.' [Citation.]" (*Id.* at p. \_\_\_ [128 S.Ct. at p. 2691].) The common law was generally codified in the Federal Rules of Evidence, rule 804(b)(6) (28 U.S.C.), which allows forfeiture by wrongdoing only when the defendant " 'engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.' " (*Giles II*, at p. \_\_\_ [128 S.Ct. at p. 2687], citing *Davis, supra*, 547 U.S. at p. 833.)[9]

The *Giles II* court based its conclusion in part on the anomaly of the contrary result: the judge would first be deciding the defendant killed the victim and therefore was subject to the forfeiture by wrongdoing rule before the jury decided whether or not the defendant had killed the victim. "The

---

[8] *Reynolds* in turn relied on a series of 17th- and 19th-century English and American cases, e.g., *Lord Morley's Case* (1666) 6 How. St. Tr. 769, 770 (H.L.) and *Williams v. The State* (1856) 19 Ga. 402. (See *Giles II, supra*, 554 U.S. at pp. \_\_\_-\_\_\_ [128 S.Ct. at pp. 2682–2684] [historical development of doctrine].)

[9] A similar limitation is expressed in Evidence Code section 1350 which states in part, "(a) In a criminal proceeding charging a serious felony, evidence of a statement made by a declarant is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness, and all of the following are true: [¶] (1) There is clear and convincing evidence that the declarant's unavailability was knowingly caused by, aided by, or solicited by the party against whom the statement is offered for the purpose of preventing the arrest or prosecution of the party and is the result of the death by homicide or the kidnapping of the declarant. [¶] (2) There is no evidence that the unavailability of the declarant was caused by, aided by, solicited by, or procured on behalf of, the party who is offering the statement." Neither side relies on Evidence Code section 1350.

boundaries of the doctrine seem to us intelligently fixed so as to avoid a principle repugnant to our constitutional system of trial by jury: that those murder defendants whom the judge considers guilty (after less than a full trial, mind you, and of course before the jury has pronounced guilt) should be deprived of fair-trial rights, lest they benefit from their judge-determined wrong." (*Giles II, supra,* 554 U.S. at p. ___ [128 S.Ct. at p. 2691].)[10]

3.  *Forfeiture by Wrongdoing Applies Not Only to Acts Intended to Prevent a Witness from Testifying but Also to Acts Intended to Dissuade a Witness from Cooperating with Law Enforcement Authorities*

■ In its supplemental briefing, the People argue that forfeiture by wrongdoing is implicated not only when the defendant intends to prevent a witness from testifying in court but also when the defendant's efforts were designed to dissuade the witness from cooperating with the police or other law enforcement authorities. We agree, and hold that the forfeiture by wrongdoing doctrine applies in both settings.

Although the United States Supreme Court in *Giles II* narrowed the exception by requiring an *intent* to prevent the witness from acting in a certain manner, the court stated in broad terms the *type of act* that triggered the exception. The court's discussion of this point came in reaction to an observation made by the dissent that if the majority had adopted a forfeiture by wrongdoing rule that was not limited by *Crawford* and *Davis*, the rule "would be particularly helpful to women in abusive relationships—or at least particularly helpful in punishing their abusers." (*Giles II, supra,* 554 U.S. at pp. ___–___ [128 S.Ct. at pp. 2692–2693].) The majority chided the dissent for essentially proposing one confrontation clause for domestic violence cases and another for all other criminal prosecutions. The court went on to say: "Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, *and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from*

---

[10] Of course even under *Giles II,* when the defendant is found to have killed the victim for the purpose of preventing his or her testimony, the judge also makes the preliminary determination that the defendant was the killer. Justice Souter, in his *Giles II* concurrence, described the conundrum, and its path to clarity, this way: "Equity demands something more than this near circularity before the right to confrontation is forfeited, and more is supplied by showing intent to prevent the witness from testifying." (*Giles II, supra,* 554 U.S. at p. ___ [128 S.Ct. at p. 2694] (conc. opn. of Souter, J.); see generally *The Price of Silence, supra,* 79 So.Cal. L.Rev. at pp. 229–231.)

*reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine.* Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify." (*Id.* at p. ___ [128 S.Ct. at p. 2693], italics added.)

The use of the disjunctive "or," in our view, reflects the court's intent to designate two alternative ways of satisfying the factual predicate for application of the forfeiture by wrongdoing doctrine: evidence that the defendant (1) intended to stop the witness from reporting abuse to the authorities; or (2) intended to stop the witness from testifying in a criminal proceeding.

### 4. *Analysis of Evidence in Light of* Giles II

We now turn to the evidence that we have concluded was testimonial under *Crawford* and *Davis*—the two statements to Officer Armendariz on June 7, 2003, and the statement to Officer Neufeld on December 30, 2003—and determine whether they come within the forfeiture by wrongdoing exception under *Giles II.*

The first component to forfeiture by wrongdoing is that the defendant must have rendered the witness unavailable to testify. (*Giles I, supra,* 40 Cal.4th at p. 854.) This is undisputed: Defendant actually testified he killed Cortez. As we discuss next, we also conclude substantial evidence supports the trial court's implied finding that defendant killed Cortez both to prevent her from cooperating with authorities and to prevent her from testifying at trial.

### a. *Intent to Stop Cortez from Reporting Abuse to Authorities*

That defendant killed Cortez to stop her from reporting his assaultive behavior to the police can reasonably be inferred from the statements defendant is heard making on the tape of Cortez's June 7, 2003 call to 911, as to which there is no evidentiary challenge: "Do you want to speak to the police?" "Are you going to talk?" "Are you going to speak with the cops? Are you going to speak?" That the killing occurred 10 months later does not minimize the significance of that evidence as defendant was twice arrested for violating the July 2003 restraining order during the intervening months, one time just weeks before the killing. The evidence suggests during the entire period defendant had the intent to dissuade Cortez from cooperating with police.

### b. *Intent to Stop Cortez from Testifying*

At the time of her death, there was pending a hearing on defendant's violation of the restraining order.[11] That defendant killed Cortez to stop her from testifying against him at the hearing is supported by evidence that he was arrested multiple times at Cortez's apartment by police responding to a call about violation of a court order and domestic violence. The trial court reasonably could have found that defendant knew he would be prosecuted for these actions and that Cortez would testify at those proceedings. Substantial evidence also supports the implied finding that once defendant broke into Cortez's home on April 10th, he knew that criminal proceedings would be commenced and as she had cooperated with the police before, Cortez was likely to testify at those proceedings.[12]

---

[11] The People's motion in limine stated that a hearing on defendant's violation of the restraining order was scheduled for April 19, 2004, just a week after the murder. Although there was no minute order or other evidence presented, the date was not challenged by the defense either at trial or on appeal.

[12] The trial court made no express findings on whether defendant killed Cortez to prevent her from cooperating or testifying. The People's motion in limine expressly raised the forfeiture by wrongdoing doctrine, but, except for an occasional reference to *Crawford* at oral argument on the motion, neither the parties nor the attorneys gave substantive attention to the point. Because the motion in limine was in the nature of a motion under Evidence Code section 400 to determine a preliminary fact, Evidence Code section 402, subdivision (c) comes into play: "A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute." (See also Evid. Code, § 1350, subd. (c).)

We also observe that neither in the trial court nor on appeal did the parties address the burden of proof that governs the determination of forfeiture by wrongdoing. Nor did the trial court make any statements on the subject. In *Davis, supra*, 547 U.S. at page 833, the court expressly took no position on the evidentiary standard, but noted that federal courts applying Federal Rules of Evidence, rule 804(b)(6) (28 U.S.C.) generally used the preponderance of the evidence standard. In *Giles II*, the majority is silent, although Justice Souter in his concurrence assumes that the standard is one of preponderance. (*Giles II*, 554 U.S. at p. ___ [128 S.Ct. at p. 2694] (conc. opn. of Souter, J.).) Our Supreme Court in *Giles I, supra*, 40 Cal.4th at page 853, expressly held the preponderance of the evidence standard applies. The court repeated that holding in *People v. Zambrano* (2007) 41 Cal.4th 1082, 1147, footnote 21 [63 Cal.Rptr.3d 297, 163 P.3d 4], disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, footnote 22 [87 Cal.Rptr.3d 209, 198 P.3d 11]. Both *Giles I* and *Zambrano* preceded *Giles II*. Because the United States Supreme Court in *Giles II* did not reject the *Giles I* burden of proof analysis, we conclude that it is still the law of California. (See *Agricultural Labor Relations Bd. v. Tex-Cal Land Management, Inc.* (1987) 43 Cal.3d 696, 709, fn. 12 [238 Cal.Rptr. 780, 739 P.2d 140]; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) We do observe that to the extent Evidence Code section 1350 codifies some aspects of the common law forfeiture by wrongdoing doctrine, the statute in part requires clear and convincing evidence. (See Evid. Code, § 1350, subd. (a)(1).) We do not attempt to reconcile the apparent conflict here.

### c. *Preventing the Victim from Reporting Abuse or Testifying Need Not Be the Sole Motive for the Killing*

Our final observation is that nothing in *Crawford, Davis, Giles I* or *Giles II* suggests that the defendant's *sole* purpose in killing the victim must be to stop the victim from cooperating with authorities or testifying against the defendant. It strikes us as illogical and inconsistent with the equitable nature of the doctrine to hold that a defendant who otherwise would forfeit confrontation rights by his wrongdoing (intent to dissuade a witness) suddenly regains those confrontation rights if he can demonstrate another evil motive for his conduct. In the absence of clear directions on this point from the United States Supreme Court or our Supreme Court, we decline to create such a rule.

Substantial evidence exists that defendant harbored the requisite motive. That he may have simultaneously intended revenge for Cortez, or to stop what he believed was her supernatural control over him, is of no assistance to him.

### d. *Harmless Error*

Finally, even if introduction of the challenged evidence was error, the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *Johnson, supra*, 150 Cal.App.4th at p. 1480.) Defendant killed Cortez—he admitted as much. No issue of identity in this case was present, and no possibility that the jury might have found defendant was the perpetrator of the killing solely because of evidence that he had attacked Cortez in the past. The only issue at trial was defendant's intent: whether he killed Cortez in the heat of passion—thus negating malice and reducing the crime from second degree murder to voluntary manslaughter. In light of the overwhelming evidence of malice, including the unchallenged tape recording of Cortez's first call to 911 and defendant's recorded statement in the back of the police car, any error in admitting Cortez's challenged out-of-court statements was harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is affirmed.

Flier, J., and Mohr, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied January 21, 2010, S178252.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.