Filed 8/17/21  P. v. Alcaraz CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JORGE ALCARAZ,<br><br>    Defendant and Appellant. | B307751<br><br>(Los Angeles County<br>Super. Ct. No. BA478878) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed.

Teresa Biagini, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Daniel C. Chang, Deputy Attorney General for Plaintiff and Respondent.

_____

# INTRODUCTION

Jorge Alcaraz poured gasoline on his wife, his son, and a friend and threatened to light them on fire. Law enforcement arrived before Alcaraz could carry out his threat.

The trial court convicted Alcaraz of child abuse under circumstances or conditions likely to cause great bodily injury or death, battery of a spouse, willfully inflicting corporal injury on a spouse resulting in a traumatic condition, two counts of assault, and second degree robbery. Alcaraz argues the court violated his Sixth Amendment right to confrontation under *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354, 158 L.Ed.2d 177] (*Crawford*) by allowing a sheriff's deputy to testify about statements by a witness who died before trial. Because the statements were nontestimonial, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Alcaraz and His Family Visit a Friend*

One evening Alcaraz, accompanied by his wife Lilia M., their five-year-old son Eduardo,[1] and their two daughters, went to visit Alcaraz's friend Ruben Ponce in Ponce's trailer. On arriving, Alcaraz went inside the trailer with Ponce, while Lilia waited in Alcaraz's truck with the sleeping children. An hour later, Alcaraz asked Lilia to come inside the trailer. Eduardo followed Lilia into the trailer, while the girls remained asleep in the truck.

---

[1] Alcaraz and his son have the same first name. We refer to Alcaraz's son by his middle name.

B.    *Alcaraz Accuses Lilia of Infidelity and Tries To Light Her on Fire*

Alcaraz and Ponce smoked methamphetamine in the back room of the trailer, while Lilia and Eduardo stayed in the front portion of the trailer.  Alcaraz returned to the front room, became angry, and accused Lilia of having an affair with Ponce and others.  Alcaraz grabbed Lilia and repeatedly asked her to "tell [him] the truth."  Lilia denied she had been unfaithful.  Ponce also denied Alcaraz's accusations and told him to calm down.  Alcaraz hit Lilia in the face, and Ponce called the 911 emergency operator.

Alcaraz took a small can of gasoline, began pouring gasoline on Lilia, and said he was going to kill her.  Lilia tried to escape through the bathroom, but was unable to fit through the small window.  Ponce dropped his phone, which disconnected the 911 call.

Ponce picked up Eduardo to comfort him.  Alcaraz poured gasoline on them as well and yelled, "Everyone's going to die."  Alcaraz told Ponce to give him his money, and Ponce, fearing for his life, gave Alcaraz $200.  Alcaraz opened the trailer door and asked Luis Castillo, who was riding his bike outside, to put the gas can and a methamphetamine pipe in the bed of Alcaraz's truck.  Alcaraz returned to Lilia, turned on a lighter, and started walking toward her.  Lilia feared Alcaraz was going to light her on fire.

As Alcaraz approached Lilia, sheriff's patrol cars turned onto the street.  Alcaraz turned the lighter off and told everyone to be quiet.

3

C.      *Sheriff's Deputies Arrive and Secure the Scene*

Los Angeles County Sheriff's Deputy Christopher Moore arrived at the trailer at 2:30 a.m., followed by several other deputies.  Deputy Moore saw Castillo riding his bike and asked him if he had called the 911 emergency operator.  Castillo said that he did not call 911, but that someone inside the trailer may have.  Deputy Moore knocked on the door of the trailer, and Alcaraz answered.  Lilia was standing behind Alcaraz, and Deputy Moore ordered both of them out of the trailer.  Lilia smelled of gasoline.  When Deputy Moore asked if anyone else was in the trailer, Alcaraz said it was only he and his wife.  Lilia said she wanted to speak with Deputy Moore away from Alcaraz. Lilia told the deputy Alcaraz had hit her.

Deputy Moore proceeded to check inside the trailer because there had been two male voices in the background of the 911 call and there was a strong smell of gasoline.  Deputy Moore found Ponce in the rear room of the trailer holding Eduardo and ordered them both out of the trailer.  Seconds later, Deputy Moore spoke with Ponce about what happened inside the trailer.

D.      *The Trial Court Convicts and Sentences Alcaraz*

Alcaraz waived his right to a jury trial.  After a court trial, the court convicted Alcaraz of second degree robbery (Pen. Code, § 211);[2] child abuse under circumstances or conditions likely to cause great bodily injury or death (§ 273a, subd. (a)); battery committed against a spouse (§ 243, subd. (e)(1)); willfully inflicting corporal injury on a spouse resulting in a traumatic

---

[2]      Undesignated statutory references are to the Penal Code.

4

condition (§ 273.5, subd. (a)); and assaulting Lilia and Ponce by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)). The trial court sentenced Alcaraz to an aggregate prison term of seven years. The trial court stayed imposition of the court operations and court facilities assessments and stayed execution of the restitution and parole revocation fines "unless or until the People provide proof of an ability to pay." Alcaraz timely appealed.

## DISCUSSION

A. *The Trial Court Did Not Err in Admitting Ponce's Statements to Deputy Moore*

1. *Relevant Proceedings*

Ponce died a month and a half before trial. The People called Deputy Moore to testify about what Ponce told him outside the trailer on the night of the incident, including Ponce's statements that Alcaraz accused Lilia of infidelity, hit Lilia in the face, took $200 from Ponce, poured gasoline on everyone in the trailer and said he was going to kill them, and did not ignite the gasoline when the deputies arrived. Counsel for Alcaraz objected to the admission of Deputy Moore's testimony about his conversation with Ponce outside the trailer, arguing that it was inadmissible under *Crawford*, *supra*, 541 U.S. 36 because by the time Ponce spoke with Deputy Moore the emergency to Lilia from any domestic violence had ended.

The trial court ruled Ponce's statements to Deputy Moore were admissible under *Crawford* as nontestimonial statements. The court explained that, when Deputy Moore arrived, he noticed

5

a strong smell of gasoline and knew "there was some kind of an emergency going on inside" the trailer.  The court stated that, although Deputy Moore spoke with Lilia when she came out of the trailer, all he knew at that point was that there was "a hint that it was a domestic violence incident," but he had no explanation for the smell of gasoline.  The court also found that there was no evidence Ponce's statements were obtained in preparation for trial and that they lacked the formality of testimonial statements under *Crawford*.  The court found Deputy Moore's observations, including that Lilia and Ponce smelled of gasoline and that the deputies found $200 in Alcaraz's possession, corroborated Ponce's statements.  The court ruled that Ponce's methamphetamine use did not "necessarily render . . . his recollection clouded or improper" and that his statements were admissible under the hearsay exception for spontaneous statements.

2.      *The Sixth Amendment Prohibits the Admission of Testimonial Hearsay*

The Sixth Amendment of the United States Constitution guarantees the right to confront adverse witnesses.  In particular, the Sixth Amendment bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford*, *supra*, 541 U.S. at pp. 53-54.)

In *Davis v. Washington* (2006) 547 U.S. 813 [126 S.Ct. 2266, 165 L.Ed.2d 224] the United States Supreme Court explained the distinction between nontestimonial and testimonial statements.  "Statements are nontestimonial when made in the

course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822, fn. omitted.) An objective evaluation of whether there is an "'ongoing emergency' at the time of an encounter between an individual and the police is among the most important circumstances informing the 'primary purpose' of an interrogation." (*Michigan v. Bryant* (2011) 562 U.S. 344, 359-361 [131 S.Ct. 1143, 179 L.Ed.2d 93].) In evaluating whether there was an ongoing emergency, courts should not "narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue." (*Id.* at p. 363.)

Although interrogations by law enforcement officials may lead to testimonial statements (*Davis v. Washington, supra,* 547 U.S. at p. 826; *Crawford, supra,* 541 U.S. at p. 53), not all interactions with law enforcement implicate the Confrontation Clause (*Michigan v. Bryant, supra,* 562 U.S. at p. 355). ""'Preliminary questions asked at the scene of a crime shortly after it has occurred do not rise to the level of an 'interrogation.' Such an unstructured interaction between officer and witness bears no resemblance to a formal or informal police inquiry that is required for a police 'interrogation' as that term is used in *Crawford.*"" (*People v. Osorio* (2008) 165 Cal.App.4th 603, 614.)

In *People v. Chism* (2014) 58 Cal.4th 1266 the California Supreme Court identified six factors for courts to consider in

7

determining whether statements are testimonial under *Crawford*. "These are (1) an objective evaluation of the circumstances of the encounter and the statements and actions of the individuals involved in the encounter; (2) whether the statements were made during an ongoing emergency or under circumstances that reasonably appeared to present an emergency, or were obtained for purposes other than for use by the prosecution at trial; (3) whether any actual or perceived emergency presented an ongoing threat to first responders or the public; (4) the declarant's medical condition; (5) whether the focus of the interrogation had shifted from addressing an ongoing emergency to obtaining evidence for trial; and (6) the informality of the statement and the circumstances under which it was obtained." (*Id.* at p. 1289; see *People v. Blacksher* (2011) 52 Cal.4th 769, 813-815.)

### 3. *Ponce's Statements Were Not Testimonial*

Alcaraz does not challenge the trial court's ruling that Ponce's hearsay statements were admissible under Evidence Code section 1240, the exception to the hearsay rule for spontaneous statements. He argues only that Ponce's statements were inadmissible under *Crawford*. Because Ponce's statements to Deputy Moore at the scene were nontestimonial, however, the trial court did not err in admitting them.[3]

The chaotic and odoriferous circumstances of Deputy Moore's conversation with Ponce outside the trailer that night were those of an ongoing and rapidly developing emergency. (See

---

[3] We review de novo whether the admission of testimony violated the defendant's rights under the Confrontation Clause. (See *People v. Garcia* (2020) 46 Cal.App.5th 123, 168.)

8

*Michigan v. Bryant*, *supra*, 562 U.S. at p. 359; *Davis v. Washington*, *supra*, 547 U.S. at p. 822; *People v. Chism*, *supra*, 58 Cal.4th at p. 1289.) The deputies who responded to the scene were faced with an immediate crisis, even after they secured Alcaraz and Lilia: They had to determine the source of the smell of gasoline to prevent a fire or explosion that could create a life-threatening risk to an unknown number of possible victims and to the deputies. (See *People v. Chaney* (2007) 148 Cal.App.4th 772, 780 [witness's answers to a police officer's questions were nontestimonial where the officer's inquiry "was directed at determining what had happened, what *might* happen in the next few minutes, and the nature of the emergency involved"].) When Deputy Moore spoke with Ponce, the deputy had no information about the source of the smell or how many people were in the vicinity and in danger. Deputy Moore was able to quickly determine where the smell of gasoline was coming from and how to neutralize the threat only by speaking with Ponce, the first person to come out of the trailer after Alcaraz and Lilia.

The lack of information from the 911 call increased the uncertainty and gravity of the situation. When the deputies arrived, they had very little information about the risks and dangers they faced. They knew the 911 call included two male voices and a female voice, yet after Castillo denied making the call, they encountered only one male and one female: Alcaraz and Lilia. And the 911 call suggested any number of dangerous circumstances, described by Deputy Moore as a "wide spectrum, pretty much from A to Z." Alcaraz's false statement that no one else was inside the trailer only increased the emergency; the 911 call suggested there was a third person at the scene. And all Deputy Moore learned from his brief conversation with Lilia was

9

the possibility of domestic violence; there was no explanation for the second male voice or the smell of gasoline.

Alcaraz argues Ponce's statements were testimonial because Deputy Moore's purpose in eliciting Ponce's statements was to document a crime that had already been committed, i.e., domestic violence. But the emergency was not over. Deputy Moore was still trying to ascertain the source of the smell of gasoline and the reason for the 911 call. He was not seeking to preserve evidence for trial; he was trying to diffuse a dangerous situation. (See *People v. Cage* (2007) 40 Cal.4th 965, 984 ["statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial"]; see, e.g., *People v. Romero* (2008) 44 Cal.4th 386, 422 [victim's statements to police officers were not testimonial where the "statements were not made primarily for the purpose of producing evidence for a later trial," but rather "provided the police with information necessary for them to assess and deal with the situation, including taking steps to evaluate potential threats to others by the perpetrators, and to apprehend the perpetrators"]; *People v. Banos* (2009) 178 Cal.App.4th 483, 497 [victim's statements to a police officer were not testimonial where the officer's "primary purpose in questioning [the victim] was to ascertain what was happening in order to resolve a dangerous situation"]; *People v. Brenn* (2007) 152 Cal.App.4th 166, 178 [victim's statements to a police officer were nontestimonial where the officer "was there to assist [the victim], not to prepare for trial"].)

10

Moreover, "to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity." (*People v. Lopez* (2012) 55 Cal.4th 569, 581; see *People v. Gomez* (2018) 6 Cal.5th 243, 297.) Deputy Moore's conversation with Ponce, which occurred almost immediately after Ponce emerged from the trailer, was unstructured, informal, and lasted "no more than five minutes." (See *Michigan v. Bryant, supra,* 562 U.S. at p. 374 [victim's statements were not testimonial where his "encounter with the police and all of the statements he made during that interaction occurred within the first few minutes of the police officers' arrival and well before they secured the scene"]; *People v. Corella* (2004) 122 Cal.App.4th 461, 469 ["[p]reliminary questions asked at the scene of a crime shortly after it has occurred" were not testimonial where "[s]uch an unstructured interaction between officer and witness [bore] no resemblance to a formal or informal police inquiry that is required for a 'police interrogation' as that term is used in *Crawford*"].)

Finally, although the record does not include the details of Ponce's medical condition when he spoke with Deputy Moore at the scene, the deputy described Ponce as "stressed out," "in a state of high alert," and "distraught." Deputy Moore also described Ponce as "very excited" and said he made "excessive hand gestures," further evidence Ponce's statements were not made in preparation for trial. (See *People v. Chism, supra,* 58 Cal.4th at p. 1287 [declarant's statements were nontestimonial where the declarant "appeared to be 'very nervous' . . . 'and shaken up'"].)

11

B.    *The Abstract Should Be Corrected To Reflect That the Trial Court Stayed Execution of the Restitution Fine*

At the sentencing hearing, the trial court stayed imposition of the court operations and court facilities assessments and stayed execution of the $300 restitution fine.  The abstract of judgment, however, does not state that the court stayed imposition of the assessments or that the court stayed execution of the restitution fine.  Alcaraz argues, the People concede, and we agree the abstract of judgment should be corrected to reflect the trial court's orders at sentencing regarding these fines and assessments.  The trial court's oral judgment controls over the abstract of judgment.  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185; *People v. Mullins* (2018) 19 Cal.App.5th 594, 612.)

## DISPOSITION

The judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

SEGAL, J.

We concur:

PERLUSS, P. J.          FEUER, J.

12