Filed 12/10/13  P. v. Lam CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C071921 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F05100) |
| v. | |
| SAM LAM, | |
| Defendant and Appellant. | |

Defendant Samuel Lam appeals the judgment entered following his conviction by jury of inflicting corporal injury on a cohabitant, false imprisonment, brandishing a firearm and assault.  He contends the trial court's admission of hearsay evidence of the victim's statements to police violated the confrontation clause.  We disagree and shall affirm the judgment.

1                                    (*SEE CONCURRING AND*
                                        *DISSENTING OPINION*)

# FACTUAL BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

On the evening of July 23, 2011, defendant's neighbor Virgilio Manganaan saw defendant driving his car in pursuit of his girlfriend (the victim), who was running toward the neighbor, saying "Help me, help me," "Call the cop[s]," and "He's gonna kill me." The victim was nervous, scared, and crying. Defendant got out of the car and stood in the street; he was angry. The victim took refuge inside the neighbor's garage and Manganaan called 911; he called a second time when the officer still had not arrived, and a recording of the second 911 call was played for the jury.

Manganaan told the 911 operator the victim "is really crying" and asking for help. The victim, crying hard, told the operator defendant's name and that he "was trying to get me and I don't want him to get me" and to "please hurry." Told by the operator that officers were on the way, the victim said, "This is not the first time he tried to do this to me. He did it to me before, a lot" and "He hit me. I got bruises all over me."

Officer Rodjard Daguman was one of the officers who responded to the 911 call. Before Daguman contacted the victim, he knew defendant had been detained in a patrol car in front of the house he shared with the victim.[1] Daguman found the victim inside the neighbor's garage. The victim was nervous, fearful, and crying and appeared shocked and confused. She had bruises and scratches "all over her face" and there were bruises "throughout her body, her knees, shoulders, [and] back." Photographs of the victim as she looked that day were shown to the jury. When Daguman asked the victim "what was going on between Mr. Lam and herself," the victim's explanation was not calm, cohesive

---

[1] Officer Daguman did not share that information with the victim and the record does not otherwise show whether the victim was then aware of defendant's detention.

and chronological; instead, her response was "all over the place" (hereafter, the first conversation).

Highly emotional, crying and speaking quickly, the victim told Officer Daguman she had been with defendant for two years; they lived together across the street. Just before Daguman arrived, the victim refused to come when defendant called; he got upset, grabbed her by the shoulder with one hand and choked her with the other hand. The victim ran away to defendant's cousin's house; when the victim started to return to the home they shared, defendant chased her, so she ran to the neighbor's house.

To explain her visible bruises, the victim also told Officer Daguman that on the two prior days, defendant grabbed her bra strap and tried to rip it off, and struck her in the arm with a metal pole. The victim said defendant also struck her in the back of the head and shoulder with a wooden chair; struck her with his fist; stabbed the bed with a 12-inch knife while she was sleeping; and twice pointed a gun at her head. Defendant used handcuffs to secure the victim against her will, and he had threatened to kill her if she left the house or called the police. The victim feared for her safety, and wanted to leave defendant.

When Officer Daguman tried to ascertain from the victim whether there were "any dangers within the home" he needed to address, the victim told him there were firearms and a machete in the house. To secure those weapons, Daguman asked the victim if he could search the house she shared with defendant, and she consented.

The victim led Officer Daguman to the house she shared with defendant; Daguman and his colleagues searched the house. They found a gun in the garage, handcuffs, and a 12-inch knife in the bedroom, and they saw where defendant had stabbed the bed and where the victim said defendant had used handcuffs to secure her against her will.

Officer Daguman then returned to where the victim stood in the driveway outside the house she shared with defendant and they spoke again (hereafter, the second

3

conversation). Approximately 20 to 30 minutes had elapsed between the time Daguman first contacted the victim and their second conversation after he had searched the house for weapons. The victim had calmed down a bit, but she was still crying and she still spoke quickly. Daguman wanted the victim to "clarify her story" and he asked her about the presence of any additional weapons so he could secure all the weapons that might be in the house. The victim told him the metal pole defendant had used to hit her, and a machete or sword, were in an upstairs closet near the stairs. At the end of her second conversation with Daguman, the victim repeated that she was afraid for her life.

A second officer, Officer Brandon Holly, spoke with defendant after the house had been searched. Defendant was calm. He admitted to Holly that the previous evening, he hit the victim, handcuffed her against her will, pointed a loaded handgun at her, and stabbed the bed. Defendant said he did these things only because he wanted her to talk to him, not because he wanted to hurt her. Defendant also admitted having once threatened the victim by saying, "If you ever leave me, I will find you and the other guy and kill you both." Defendant denied striking the victim with the metal pole, and denied having had any physical altercation with the victim on the day of his arrest.

Defendant was charged with inflicting corporal injury on a cohabitant, assault with a deadly weapon (i.e., the metal pole), false imprisonment, and brandishing a firearm.

The matter was tried to a jury. The victim did not testify. Over defendant's objection that the victim's statements to Officer Daguman should not be admissible as spontaneous utterance exceptions to the hearsay rule and should not be admitted because defendant would be deprived of his Sixth Amendment right to confront and cross-examine her, Daguman testified about his first conversation with the victim in the neighbor's garage and their second conversation at the house she shared with defendant.[2]

_____

[2] The trial court found that the victim's statements to Officer Daguman were made while she was in an excited state, and found that there was no violation of the rule articulated in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*) because it

4

Officer Holly also testified the victim told him defendant had hit her with the metal pole on her back and shoulders.

The jury found defendant guilty of inflicting corporal injury on a cohabitant (Pen. Code, § 273.5, subd. (a)), false imprisonment (*id.*, § 236), and brandishing a firearm (*id.*, § 417, subd. (a)(2)). It found him not guilty of assault with a deadly weapon, and guilty instead of simple assault as a lesser included offense (*id.*, § 240).

## DISCUSSION

Defendant's sole contention on appeal is that the victim's statements to Officer Daguman were out-of-court, testimonial statements and should not have been admitted at trial under *Crawford*, *supra*, 541 U.S. 36 [158 L.Ed.2d 177] and *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224] (*Davis*). The People respond that the victim's statements to Daguman were admissible exceptions to the hearsay rule, and thus were not testimonial.

Whether evidence was admitted in violation of the confrontation clause is subject to an independent review.[3] (*Lilly v. Virginia* (1999) 527 U.S. 116, 137 [144 L.Ed.2d 117]; *People v. Seijas* (2005) 36 Cal.4th 291, 304.)

---

was "an emergency situation," the officers were waiting for backup, and the neighbors were also fearful of defendant.

[3] We do not address the People's assertion that the evidence is admissible as the victim's "spontaneous statement" because defendant does not argue on appeal that the testimony was hearsay under state law. We note, however, that—while the analyses are separate and whether a statement is admissible hearsay under state law does *not* mean it is admissible as a nontestimonial statement under the rule established in *Crawford* and *Davis*—"there is some overlap between the spontaneous statement hearsay exception under [Evidence Code] section 1240 and the nontestimonial nature of spontaneous statements under *Crawford* and *Davis*." (*People v. Banos* (2009) 178 Cal.App.4th 483, 493-494, fns. 2, 3 (*Banos*), citing *People v. Pedroza* (2007) 147 Cal.App.4th 784, 792-794 [it is " ' "difficult to identify any circumstances" ' " under which a spontaneous statement would be testimonial"]; *People v. Corella* (2004) 122 Cal.App.4th 461, 469.)

## I. Applicable Legal Principles

In *Crawford*, *supra*, 541 U.S. 36, the United States Supreme Court held that " '[t]estimonial statements of witnesses absent from trial [can be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.' " (*Williams v. Illinois* (2012) 567 U.S. ___ [183 L.Ed.2d 89, 103], quoting *Crawford*, *supra*, 541 U.S. at p. 59 [158 L.Ed.2d at p. 197].) The victim here did not testify at trial or at the preliminary hearing and defendant had no prior opportunity to cross-examine her. Therefore, her statements to Officer Daguman were admissible only if they were nontestimonial. (Cf. *Davis*, *supra*, 547 U.S. at p. 821 [165 L.Ed.2d at pp. 236-237].)

Statements are nontestimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis*, *supra*, 547 U.S. at p. 822 [165 L.Ed.2d at p. 237].) In *Davis*, the Supreme Court held nontestimonial, and therefore admissible, tape-recorded statements made by a domestic violence victim during a 911 call, in which the victim responded to the 911 operator's questions by identifying her assailant as the defendant, and describing what he was doing to her as the call progressed. (*Davis*, *supra*, 547 U.S. at pp. 817, 828-829 [165 L.Ed.2d at pp. 234, 241-242].)

*Davis* was decided together with a consolidated companion case, *Hammon v. Indiana* (2006) 547 U.S. 813 [165 L.Ed.2d 224] (*Hammon*). In *Hammon*, police officers responding to a domestic violence call encountered the victim alone on the front porch of her home; she appeared somewhat frightened, but denied that anything was wrong. After the officers entered the home, one of them questioned the victim outside the defendant's presence, and she responded that the defendant had thrown her down onto broken glass

6

and punched her in the chest.  The Supreme Court held that because there was no ongoing emergency at the time, and no continuing immediate threat to the victim, the statements made in *Hammon* were obtained for the purpose of investigating a past crime, rather than to guide police who were intervening in an ongoing emergency.  Thus, the statements were testimonial, and their admission was barred by the confrontation clause.  (*Hammon*, *supra*, 547 U.S. at pp. 819-821, 830 [165 L.Ed.2d at pp. 235-236, 242].)

The California Supreme Court interpreted *Davis* in *People v. Cage* (2007) 40 Cal.4th 965 (*Cage*).  In *Cage*, the court concluded that statements made by the teenaged victim to a deputy sheriff about an assault by his mother were testimonial.  The deputy had earlier visited the mother's home after receiving reports of a domestic disturbance, and had observed blood and broken glass there.  An hour later, he was called to a location where the victim was seated on the curb, his face slashed.  Thus, when the deputy questioned the youth, the crime had been over for more than an hour; the assailant and the victim were geographically separated; the victim was no longer in danger.  (*Id.* at pp. 985-986.)

The *Cage* court reasoned that for an unsworn statement to be testimonial, it "must have been given and taken *primarily* for the *purpose* . . . [of] establish[ing] or prov[ing] some past fact for possible use in a criminal trial," an issue that is "to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants . . . ."  (*Cage*, *supra*, 40 Cal.4th at p. 984.)  Accordingly, responses to questions from police "in a nonemergency situation, . . . where deliberate falsehoods might be criminal offenses," are testimonial, and "statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial."  (*Cage,* at p. 984.)

Two recent Court of Appeal cases involved domestic disputes and considered whether statements by the victims were testimonial.  In one, *People v. Saracoglu* (2007)

7

152 Cal.App.4th 1584 (*Saracoglu*), a woman and her child came to a police station and spoke to two officers there. The woman was nervous, crying, upset, and scared, and had visible cuts and bruises. She told the police that 30 minutes earlier, the defendant had choked, pushed, hit, and threatened her, and said he would shoot her if she went to the police. She also explained she had come to the police station because she was afraid of the defendant, and accepted the officers' offer to get her an emergency protective order. The officers then went to her home and arrested the defendant. When the woman failed to appear to testify at the defendant's trial, the trial court permitted one of the police officers to testify at trial about what the woman told him at the police station. (*Saracoglu*, at p. 1587.) The Court of Appeal, Second Appellate District, Division Three, upheld the trial court's ruling because "[o]bjectively viewed, the primary purpose of [the woman]'s initial interrogation by [the officer] was 'to deal with a contemporaneous emergency, rather than to produce evidence about past events . . . .' " (*Id.* at p. 1597.) The court noted that the woman told the police that the defendant had threatened to kill her if she went to them. This implied that she could not return home without facing that threat; thus, her visit to the police station constituted part of an ongoing emergency situation. (*Ibid*.)

The second case, *Banos*, *supra*, 178 Cal.App.4th 483, by the Court of Appeal, Second Appellate District, Division Eight, involved a defendant accused of killing his ex-girlfriend after a history of domestic violence against her. The prosecution offered evidence of statements that the victim made to police prior to her killing: (1) during a June 2003 meeting with a police officer in the victim's apartment, in which she related that the defendant had punched and threatened her earlier that day, and then called while she was waiting for the police to arrive and threatened to kill her; (2) during another meeting with the same police officer later the same day, in which the victim told the officer that the defendant had come back to her apartment after the officer left, and had hit her and threatened her again; (3) during a December 2003 meeting with police in

8

which the victim reported that the preceding night the defendant had refused to leave and threatened to kill her if she called police; (4) during a 911 call in March 2004, in which the victim told the dispatcher that the defendant was inside her apartment, in violation of a restraining order, and that she was afraid he would attack her; and (5) during a conversation with the officer who responded to the same 911 call, in which the victim reiterated what she had told the dispatcher. (*Banos,* at pp. 491-492.)

The *Banos* court held that only the victim's statements during the March 2004 call to 911, and her statements to the officer who responded to the call, were admissible as nontestimonial because the victim's "primary purpose for making the statements to the 911 dispatch officer was to gain police protection" in the context of an "ongoing emergency." (*Banos, supra*, 178 Cal.App.4th at p. 497.) The court held that the other three statements were testimonial for confrontation clause purposes because, on each occasion, the victim was reporting past events at a time when there was no ongoing emergency. (*Id*. at pp. 497-498, 498-504 [ultimately holding that the otherwise testimonial statements were nonetheless admissible under the forfeiture by wrongdoing exception to the confrontation clause, as the defendant killed the victim both to prevent her from cooperating with authorities and to prevent her from testifying].)

## II. Application to This Case

Defendant contends all of the victim's statements to Officer Daguman were testimonial and should not have been admitted absent an opportunity to confront and cross-examine her because "the statements were not necessary to respond to a currently occurring emergency," inasmuch as they related to events that had already occurred, and were made while defendant had been detained.

To be sure, some factors suggest statements made during both the first and second conversations between Officer Daguman and the victim could be viewed as testimonial: the threats, assault and injury reported by the victim had already occurred and defendant

9

was at least temporarily detained in a patrol car at the scene. But objectively viewing the totality of the circumstances, we conclude the *primary* purpose of Officer Daguman's first conversation with the victim while she was inside the neighbor's garage was to "deal with a contemporaneous emergency, such as assessing the situation [or] dealing with threats . . . ." (*People v. Romero* (2008) 44 Cal.4th 386, 422; *Cage, supra*, 40 Cal.4th at p. 984.) The victim ran crying to her neighbor that defendant was "gonna kill" her; the neighbor saw defendant in anger, and he twice called the police. Responding to the 911 calls, Daguman confronted an obviously distraught woman who was crying and afraid, had begged her neighbor to call police, and was hiding inside the neighbor's garage. (cf. *Banos*, *supra*, 178 Cal.App.4th at p. 497.) The victim had bruises and scratches all over; she was shocked, confused, and fearful. When asked what "was going on" with defendant, the victim related that she had been suffering fairly continuous abuse at defendant's hands for three days and he had pointed a gun at her, handcuffed her against her will, tried to choke her just that morning, and threatened to kill her if she left the house or called the police. (See *Saracoglu*, *supra*, 152 Cal.App.4th at p. 1597 [one of the chief reasons the *Saracoglu* court found the victim's statements admissible in that case is because the defendant had threatened to kill the victim if she went to the police, meaning the "emergency was ongoing"].) In light of the victim's demeanor and visible injuries and defendant's threats, Daguman—as the officer responding to a 911 call of a possibly violent domestic dispute in progress—sought to "assess the situation, the threat to [his] own safety, and possible danger to the potential victim" and "[s]uch exigencies may *often* mean that 'initial inquiries' produce nontestimonial statements." (*Davis, supra,* 547 U.S. at p. 832 [165 L.Ed.2d at p. 243].) The victim's statements about how she was injured and threatened, and what weapons remained at defendant's disposal represented nontestimonial "cr[ies] for help" and "the provision of information enabling officers immediately to end a threatening situation." (Cf. *id*. at pp. 830, 832 [165 L.Ed.2d at pp. 242, 243].)

10

In our view, however, circumstances changed somewhat during the 20 or 30 minutes that elapsed between Officer Daguman's first and second conversations with the victim. The victim was calmer during her second conversation with Daguman, which occurred while the victim stood outside the house she shared with defendant, and she likely then could have seen that defendant was inside the patrol car. As the Supreme Court recognized in *Davis*, the dynamics present in any investigative situation can change and "a conversation which begins as an interrogation to determine the need for emergency assistance . . . [may] 'evolve into testimonial statements,' once that purpose has been achieved." (*Davis*, *supra*, 547 U.S. at p. 828 [165 L.Ed.2d at p. 241].) Daguman testified that his second conversation with the victim occurred *after* officers searched the house for weapons with her consent and found a gun, handcuffs and the knife defendant had used to stab the bed where the victim lay. At that point, Daguman sought to have the victim "clarify her story" but he did not indicate what points required "clarification" or what, if any, clarification the victim may have given: Daguman testified only that he asked her about the presence of additional weapons in the house so he might secure them, and she told him that the metal pole and the machete could be found in an upstairs closet. At that point, the initial emergency had passed (cf. *Hammon*, *supra*, 547 U.S. at pp. 820-821, 830 [165 L.Ed.2d at pp. 236, 242]). The victim's statements during her second conversation with Daguman were not "a cry for help nor the provision of information enabling officers immediately to end a threatening situation, [therefore] the fact that they were given at an alleged crime scene and were 'initial inquiries' " did not render them nontestimonial.[4] (See *Davis, supra*, 547 U.S. at p. 832

_____

[4] Officer Daguman's notes of his conversation with the victim do not distinguish what she said during the first and second conversations and defendant makes no attempt to distinguish between statements made over time by the victim to Daguman. Rather, he declares all of them testimonial and argues the court erred in admitting all of them. As stated above, we reject that analysis: The evidence showed Daguman's primary purpose in his first conversation with the victim was to render assistance and determine "what was

11

[165 L.Ed.2d at p. 243].)  Because defendant had no opportunity to cross-examine the victim about her statements to Daguman during their second conversation, Daguman should not have been permitted to testify about them at trial.[5]  (Cf. *Davis*, at p. 821 [165 L.Ed.2d at pp. 236-237].)

We nonetheless conclude that any error resulting from allowing Officer Daguman to testify about the victim's statements to him during his second conversation was harmless beyond a reasonable doubt.  (Cf. *Cage*, *supra*, 40 Cal.4th at pp. 991-994 [finding erroneous admission of testimonial hearsay harmless beyond a reasonable doubt].)  The victim's second conversation with Officer Daguman on the sidewalk outside her house appears to have concerned the location inside the house of the metal pole and the machete.  The jurors had already heard about defendant's having hit the victim with the metal pole and his fists through the victim's nontestimonial statements to Daguman during their first conversation.  And jurors learned about the other events that formed the basis of the charges from defendant's own admissions to police:  Defendant admitted hitting the victim, slapping her, punching her, handcuffing her against her will, pointing a loaded handgun at her as they argued, stabbing the bed while she lay in it to scare her, and threatening to kill her.  Defendant's version of events differed chiefly from the victim's in his claim that he did not do these things because he wanted to hurt her, but because he was "trying to get her to speak to him" or out of possible jealousy.

---

going on" between the victim and defendant.  That the victim's response was "all over the place" and included some information about what *had* happened rather than "what was happening" does not render her initial conversation with Daguman testimonial.

[5] Because we find that the victim's statements to Officer Daguman during their first conversation were nontestimonial and thus properly admitted through his testimony at trial, we need not address defendant's claim in his brief and during oral argument that, if all of the victim's statements are excluded, there remains no evidence to establish the *corpus delicti* of the counts underlying his convictions for false imprisonment, brandishing a firearm, and simple assault.

Accordingly, we conclude any error attributable to the admission of testimonial statements by the victim to Officer Daguman during their second conversation was harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is affirmed.

                                          _____BUTZ_____, J.

I concur:

_____RAYE_____, P. J.

Hull, J.

I concur in part and dissent in part. As to the majority's holding that any error in admitting Elk Grove Police Officer Rodjard Daguman's testimony about the victim's statements to him during his second conversation with her was harmless beyond a reasonable doubt, I concur. As to the majority's holding that admitting that testimony was error, I dissent.

"The Confrontation Clause of the Sixth Amendment provides 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' In *Crawford v. Washington*, 541 U.S. 36, 53-54 [158 L.Ed.2d 177] (2004), we held that this provision bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' A critical portion of this holding . . . is the phrase 'testimonial statements.' Only statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. See *id.*, at 51 [158 L.Ed.2d 177]. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause. [¶] . . . [¶]

" . . . Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 821-822 [165L.Ed.2d 224, 236-237] (*Davis*).)

In *People v. Cage* (2007) 40 Cal.4th 965 (*Cage*), the California Supreme Court said: "We derive several basic principles from *Davis*. First, . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-

court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony--to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Cage*, at p. 984, fns. omitted.)

Prior to jury selection, the court conducted a hearing pursuant to section 402 of the Evidence Code to decide the admissibility of statements the victim of the domestic violence at issue made to Daguman.

Daguman's testimony during the Evidence Code section 402 hearing and before the jury established the following.

Daguman testified that he was called to the location of a report of domestic violence on July 23, 2011, at about 8:15 p.m. When he arrived there, he spoke to the apparent victim of the assault for approximately 20 to 25 minutes. She was distraught, fearful and crying and appeared to be in shock. She said her boyfriend, the defendant, had choked her earlier that evening in their garage, but she had been able to break the choke hold and leave the house. She later returned to her house on a bicycle but ran to a neighbor's house when defendant saw her coming home.

The victim told Daguman that the defendant had been abusing her for about 20 days. On July 20 the defendant had become upset with her while they were at the house and grabbed her bra strap and pulled on it which caused her to have bruises and scratches on the top of her shoulder. The victim reported that there was a firearm in the house that, on July 20 and July 22, defendant had pointed at her head. Also on July 22, the defendant hit her with a metal pole.

The victim gave the officers permission to enter her house to look for firearms. The victim told Daguman that her bedroom was on the second floor. Inside the house the officers found a firearm in the garage near a tool box and found handcuffs and a 12-inch knife next to the handcuffs in the bedroom. After the officers found the knife, Daguman went back outside to the front of the house to speak to the victim further. Between 20 and 30 minutes had elapsed since his first conversation with the victim.

Although Daguman testified that he spoke to the victim the second time "just to clarify her story," he also testified that, as a police officer, his function was to go through the house and "neutralize" any dangers, which was his main objective in the house. When he came out of the house the first time and had his second conversation with the victim, his objective was to ask about and secure additional weapons because she had said she had been hit with a "baton," had been secured by handcuffs, and that defendant had used the 12-inch knife they had found to stab or cut the bed she was sleeping in which caused her to fear for her life.

By the time of this second conversation, the victim had calmed down some but her speech was still fast and she was crying. When asked about additional weapons being in the house, the victim said the metal pole and a machete were in an upstairs closet near the stairs. Regarding the handcuffs the police had found, she explained that defendant used them to secure her to vehicle parts that the officers had found in the living room.

3

When the officers searched the house after Daguman's second conversation with the victim, they found a machete and a pipe about 24 inches long with black tape extending six inches or so up the pipe.

At some point the victim said that defendant had threatened to kill her if she went to the police.

The majority concludes that it was error to admit Daguman's testimony regarding what the victim said to him during the second conversation because that conversation constituted a testimonial statement. The majority relies on the thought that the "initial emergency had passed" (maj. opn., *ante*, at p. 11) and that the victim's statements were not " 'a cry for help nor the provision of information enabling officers immediately to end a threatening situation, [therefore] the fact that they were given at an alleged crime scene and were "initial inquiries" 'did not render them nontestimonial." I cannot agree.

While it is true that the officer testified that his second conversation was intended to "clarify" the victim's story, in my view, the primary purpose of the second conversation was to follow up on the victim's first conversation with Daguman during which she said she had been hit with a pole and that there was a machete in the house, neither of which had been found during the first search of the house. That is, it was an "interrogation under circumstances objectively indicating that the primary purpose of the interrogation [was] to enable police assistance to meet an ongoing emergency." (*Davis, supra,* 547 U.S. at p. 822 [165 L.Ed.2d at p. 237].) It does not appear to me that, viewing the circumstances objectively, the second statement was "given and taken *primarily* for the *purpose* ascribed to testimony--to establish or prove some past fact for possible use in a criminal trial." (*Cage, supra,* 40 Cal.4th at p. 984.)

The majority holds, in effect, that a "contemporaneous emergency" or an "ongoing emergency," has ended when there is no longer an immediate threat to the victim. I do not read those phrases so narrowly. Where, as here, there is a threat to the victim posed

4

by readily available weapons in her home, there is still an "ongoing emergency," even though the threat is not temporally immediate.

In this matter, after the search of the house, the law enforcement officers had not been able to locate weapons, specifically a metal pole and a machete, one of which had been used against the victim and both of which could cause her serious bodily injury or death in the future. They spoke to the victim a second time primarily to attempt to find those weapons. While there was no "immediate threat" to the victim at the time of the second conversation given the fact that defendant was detained in a patrol vehicle and, apparently, later arrested, the threat to the victim was not over. In the event defendant was released, on bail or otherwise, and returned to the house while she was there, he would have had the immediate means to make good on his earlier threat to kill the victim if she went to the police so long as weapons remained in her house. Since the primary purpose of the second interrogation was to find the weapons that remained in the house, the second interrogation cannot be characterized as one intended primarily to produce evidence about past events for use in a later trial.

I would affirm the judgment.

_____HULL_____, J.