Filed 2/13/14

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE CARMEN MURILLO GARCIA,<br><br>    Defendant and Appellant. | 2d Crim. No. B236898<br>(Super. Ct. No. A521156)<br>(Los Angeles County) |

In 2011 a jury convicted Jose Carmen Murillo Garcia of first degree murder with a firearm enhancement in the September 9, 1976 death of Roberto Lozano. The verdict was reached after Garcia's third trial; two previous jury trials ended in mistrials. The trial court sentenced Garcia to life with the possibility of parole plus five years for the firearm enhancement. He appeals, contending that he was denied his rights to a speedy trial, due process, and to confront a key witness against him. Garcia also contends that the trial court improperly denied his motions to dismiss in the interests of justice after his first and second trials and made prejudicial evidentiary rulings and sentencing errors. We correct the sentencing errors and otherwise affirm.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are identified as those portions between double brackets, e.g., [[/]].

*FACTS AND PROCEDURAL HISTORY*

*The Murder and the Investigation*

At approximately 4:00 p.m. on September 9, 1976, Baldwin Park Police Officers were called to the scene of a homicide on Baldwin Park Boulevard. They found victim Roberto Lozano (Roberto)[1] slumped over dead in the driver's seat of a white 1968 Ford. He had been shot with a .22 caliber firearm. The police found several .22 caliber shell casings in the car. The police investigation revealed that Roberto, Garcia and a third person later identified as Pablo Chavez had been in a bar not far from the scene and that they left the bar together at about 3:45 p.m.

The police interviewed Barbara Ornellas, who was standing in her front yard across the street from the site of the crash. Ornellas reported that she saw the white Ford turning onto her street, followed by a green car. The passenger in the white Ford pointed a gun at the driver's head and shot the driver four or five times. The Ford jumped the curb opposite Ornellas's house and crashed into a chain link fence. The green car stopped in the middle of the street with the engine running. The shooter exited the white Ford with a gun in his hand, walked toward the green car and got into the front passenger seat. The green car made a U-turn and drove off. Ornellas later identified Garcia as the shooter from a six-pack photo display.

Later on the day of the murder, a California Highway Patrol officer found a .22 caliber Beretta pistol next to the 605 Freeway near the junction with Interstate 10. A sheriff's department firearms examiner determined that the shell casings recovered from the white Ford were fired from this Beretta pistol.

Several witnesses, including Norberto Lozano and Rudolfo Zavala, told police that Garcia drove a 1969 green Pontiac. Zavala testified that he cosigned for Garcia when Garcia purchased the green Pontiac. Following up on tips received from friends of Garcia, the police located the green Pontiac in San Ysidro, California,

---

[1] Because several witnesses, as well as the victim, share the name Lozano, we refer to the Lozanos by their first names for clarity.

2

near the Mexican border, on October 1, 1976.[2]  The car was registered to Rudolfo Zavala.  It contained an insurance application and an auto body repair order in Garcia's name.

A felony complaint was filed against Garcia on September 17, 1976, and on September 20, 1976, a warrant was issued for his arrest.  Law enforcement made no further efforts to find Garcia after October 1976.

Thirty-three years later, on May 5, 2009, Baldwin Park police received a tip from the FBI that Garcia was in Laredo, Texas.  He was arrested that day and returned to California.  On July 21, 2009, following a preliminary hearing, Garcia was charged by information with the murder of Roberto Lozano.

*Pablo Chavez*

Following Garcia's arrest in 2009, Baldwin Park Police located Pablo Chavez in prison in California.  The police interviewed him twice before Garcia's preliminary hearing.

At the preliminary hearing, Chavez testified that he had been at a bar with Garcia and Roberto on September 9, 1976.[3]  Garcia and Roberto left the bar together in Roberto's white Ford and Garcia told Chavez to follow them in Garcia's green Pontiac, tossing Chavez the keys.  Chavez followed, heard gunshots and saw Roberto's car crash into a fence.  Chavez ran to the white Ford and saw Roberto slumped over in the driver's seat, dead and covered with blood.  Garcia exited Roberto's car.  Chavez asked him, "What did you do?" and Garcia responded, "Let's split for San Ysidro."  Garcia and Chavez then got into the green Pontiac and Garcia repeated the order to "Go ahead and go to San Ysidro."  Chavez drove to San Ysidro as instructed.  En route, while they were driving on the 605 Freeway near the junction of the I-10 Freeway, Garcia threw something that looked "like a gun" out of

---

[2] San Ysidro is a district in the south of San Diego, immediately north of the United States – Mexico border, where Interstate 5 and a pedestrian walkway cross into Tijuana.

[3] At trial Chavez testified that Garcia told him while they were at the bar that Roberto had sexually molested Garcia's wife.

3

the car. Chavez continued driving to San Ysidro, where he and Garcia left the green Pontiac in a parking lot. Garcia and Chavez then walked across the border into Tijuana, where they separated. Chavez had no further contact with Garcia. Chavez returned to California several months later.

[[When Baldwin Park Police located Chavez in prison in 2009, he was scheduled to be returned to Mexico upon his release. The police obtained permission from the United States State Department to have Chavez "paroled" to Baldwin Park Police as long as trial was pending. The police did not have Chavez in custody pending the trial; he stayed with his family. The police understood that Chavez would be returned to Mexico on November 30, 2009.

*The Three Trials*

Pablo Chavez testified at Garcia's first trial, which began on November 3, 2009. The jury deadlocked nine-to-three in favor of acquittal on November 17, 2009. On November 20, 2009, the trial court set a retrial date of January 11, 2010. On November 25, 2009, the prosecution's trial counsel advised Garcia's counsel that Chavez was being returned to Mexico and that she intended to have him return for the retrial. Chavez was returned to Mexico in early December. Police had no address for Chavez in Mexico, but they had the address of his wife and son in Perris, California.

Chavez gave Detective Real of Baldwin Park Police a cell phone number that Real used to contact Chavez in Mexico. In January 2010 Chavez informed Detective Real that he was in Tijuana and that his family in Mexico was receiving death threats. In February 2010 Detective Real asked Chavez to return and testify at the second trial. Chavez "was adamant [that] he wasn't going to return because of those death threats." Chavez also told Detective Real that "his family lived in [the Mexican state of] Guerrero which, according to him, . . . had a lot of drug violence and kidnappings there."

After several continuances, the second trial began on August 31, 2010. Detective Real kept in regular contact with Chavez's wife and son in Perris

4

throughout the first half of 2010. He also conducted monthly two-day stakeouts at the Perris home between the first and second trials. As of March 25, 2010, Chavez's son did not know where Chavez was. On July 20, 2010, Detective Harvey of Baldwin Park Police ran a criminal check on Chavez and found no record of new arrests in the United States. Detective Harvey made several inquiries to the Mexican Consulate for assistance, but received no return calls. Detective Harvey also contacted the Department of Homeland Security, which had no record of Chavez re-entering the United States.

On August 25, 2010, the trial court found Chavez to be unavailable and allowed the reading of his testimony at the second trial. The second trial ended in a mistrial on September 20, 2010. This time the jury deadlocked eight-to-four in favor of conviction. On September 30, 2010, the trial court set a third trial, which began on September 21, 2011.

Detective Real resumed his efforts to locate Chavez on May 9, 2011. United States Customs confirmed that Chavez had not returned to the United States. Detective Real searched for and found no record of arrests in California. He contacted Chavez's wife, who told him that Chavez had not come back, was not coming back and that she had no contact information for him. Suspecting that Mrs. Chavez was being evasive, Detective Real conducted surveillance of the Perris house. He conducted a dozen stakeouts between the second and third trials. Chavez did not appear.

Garcia requested a hearing to determine whether Chavez was unavailable for the third trial. Finding that the People had exercised reasonable diligence to produce Chavez, the trial court found Chavez to be unavailable and permitted the introduction of his testimony from the first trial at the third trial. The jury returned a guilty verdict.]]

5

*DISCUSSION*

*I. Speedy Trial*

Garcia contends that the 33-year delay between the filing of the criminal complaint and his arrest violated his state right to a speedy trial and his state and federal right to due process. The California Constitution guarantees a criminal defendant's right to a speedy trial. (Cal. Const. art. 1, § 15.) Under both state and federal law, due process of law also bars prejudicial delay in bringing a defendant to trial. (*People v. Martinez* (2000) 22 Cal.4th 750, 754; *Doggett v. United States* (1992) 505 U.S. 647, 655, fn. 2.) Both rights are triggered by the filing of a criminal complaint. (*People v. Martinez, supra*, at p. 754.)[4] To prevail on either speedy trial or due process grounds, the defendant must first show prejudice caused by the delay, whereupon the burden shifts to the prosecution to justify the delay. The court then balances the harm against the justification. (*Jones v. Superior Court* (1970) 3 Cal.3d 734, 741.) We uphold the trial court's ruling or decision on appeal if it is supported by substantial evidence. (*People v. Mitchell* (1972) 8 Cal.3d 164, 167.)

*A. Waiver of Right to Speedy Trial*

The People urge us to bypass this balancing test and to find instead that Garcia forfeited his right to speedy trial by fleeing California to avoid prosecution. (*People v. Perez* (1991) 229 Cal.App.3d 302.) We agree. "'[A] defendant who flees the jurisdiction of a court for the purpose of avoiding prosecution waives the right to a speedy trial.' [Fn. omitted.]" (*Id.* at p. 308.) The balancing test described above "does not come into play when the defendant has fled the jurisdiction for the purpose of avoiding prosecution. [T]he fugitive, having done all he or she can do to avoid

---

[4] Garcia does not assert his speedy trial right under the Sixth Amendment to the United States Constitution, which is not triggered until either arrest or the filing of an indictment or information. (*People v. Martinez, supra*, at pp. 754-755.)

being brought to justice, cannot then claim that denial of the right to speedy trial resulted from the ensuing delay." (*Id*. at p. 314.)

In *Perez*, the defendant was indicted in 1978 for murder in California. He was not aware of the indictment. A week later, he was arrested on federal drug charges in Puerto Rico. At a bail hearing on the drug charges, the federal agent who arrested defendant informed the court, in defendant's presence, "'that there were charges to be filed, very serious charges, by the State of California,'" against the defendant. (*People v. Perez*, *supra*, 229 Cal.App.3d at pp. 305-306.) The defendant was released on his own recognizance and disappeared. Eight years later he was located in Venezuela, was arrested and returned to California. At the hearing on the defendant's speedy trial motion, a federal agent testified that he had interviewed the defendant in Venezuela after his arrest and the defendant informed him "'that he didn't want to come to the United States because he had killed two people in California . . . and he was afraid he was going to be prosecuted on that.'" (*Id*. at p. 307.) The court held that "a defendant who flees the jurisdiction of a court for the purpose of avoiding prosecution waives the right to a speedy trial.' [Fn. omitted.]" (*Id*. at p. 308.)

The waiver of the right to a speedy trial, like all waivers, must be knowing: a defendant who leaves the court's jurisdiction not knowing charges are pending does not thereby waive the right to a speedy trial. (*People v. Perez*, *supra*, 229 Cal.App.3d at p. 308, fn. 4; s*ee also Doggett v. United States*, *supra*, 505 U.S. at p. 653 [no forfeiture of speedy trial right found where defendant did not know of the charges against him until his arrest].) Garcia contends that he did not waive his right to a speedy trial because he did not know charges were pending against him until he was arrested in 2009. The People presented substantial evidence, however, that Garcia was aware that he was subject to prosecution for Roberto's murder when he fled to Mexico. At Garcia's preliminary hearing Chavez testified that when he saw Roberto dead and covered with blood in the white car, he asked Garcia, "What did you do?" Garcia responded by ordering Chavez "Let's split for San Ysidro." After

7

Garcia and Chavez got into the green car Garcia repeated the instruction: "Go ahead and go to San Ysidro." Chavez did as he was told and drove Garcia to the Mexican border at San Ysidro, where they walked across the border together. Along the way Garcia discarded what "looked like" a gun. This testimony was substantial evidence that Garcia fled the jurisdiction to avoid prosecution for Roberto's murder and compels the reasonable inference that he did so.

It does not matter that charges had not been filed against Garcia when he fled. As the court explained in *Perez*, "[i]t does not matter that defendant had not been informed of the exact nature of the charges . . . before he fled to Venezuela" because he had been informed the day before he fled that "serious charges" against him were pending in California. (*People v. Perez*, *supra*, 229 Cal.App.3d at p. 309.) Perez's admission that he had killed two people in California and was afraid he would be prosecuted for them "demonstrates defendant was aware of the nature of the charges and actively sought to avoid prosecution." (*Ibid.*)

Garcia's instructions to Chavez to drive him to the border immediately after the killing demonstrate his knowledge that he would be prosecuted for Roberto's murder and "actively sought to avoid" that eventuality. Although Garcia argues that Chavez was an unreliable witness, the trial court credited his testimony concerning Garcia's flight. Chavez's testimony was also corroborated by the evidence that Garcia's car was found in San Ysidro where Chavez said he left it and by the CHP's recovery of a firearm where Chavez testified Garcia discarded what looked "like a gun." Substantial evidence demonstrates that Garcia fled California to avoid prosecution for Roberto's murder.[5]

---

[5] Although the trial court did not expressly find that Garcia waived his speedy trial right by fleeing to avoid prosecution, its denial of Garcia's speedy trial motion was correct on that theory for the reasons explained in the text. We sustain the trial court's ruling "regardless of the considerations which may have moved the trial court to its conclusion." (*In re Pickett* (1972) 25 Cal.App.3d 1158, 1163.)

[[*B. Evidentiary Hearing*

At the hearing on Garcia's speedy trial motion, his counsel asked for leave to present additional evidence supporting his motion, consisting of testimony of Garcia's wife and others that Garcia did not flee to Mexico on September 9, 1976, but remained in California within reach of law enforcement. Garcia claims that the trial court abused its discretion when it denied his request. There was no abuse of discretion. Garcia did not properly present his request for an evidentiary hearing to the trial court: he did not request such a hearing in his motion and did not attach to his motion any declarations describing the evidence he wanted to present. The trial court did not deny Garcia's request in any event. The trial court twice stated that it would give him the opportunity to introduce additional evidence if he thought it was necessary. Garcia's counsel did not press the issue, however, and did not protest when the trial court ruled on the speedy trial motion without hearing additional evidence. By not pressing for a ruling, Garcia deprived the trial court of the opportunity to correct potential error and failed to preserve the issue for appeal. (*People v. Ramirez* (2006) 39 Cal.4th 398, 450.)

Even if the trial court effectively denied Garcia's request for an evidentiary hearing, it did not abuse its discretion. "In determining the admissibility of evidence, the trial court has broad discretion." (*People v. Williams* (1997) 16 Cal.4th 153, 196.) At the hearing Garcia made an offer of proof of the evidence he wanted to offer: testimony from witnesses, including Garcia's wife, that Garcia was in Sanger, California throughout the latter half of 1976 and thus was not in Baldwin Park on the day of the murder. The trial court stated that such evidence would be irrelevant in light of Chavez's testimony about Garcia's flight. Because the trial court heard Garcia's offer of proof and was unpersuaded, it did not abuse its discretion by failing to hear Garcia's evidence.

## II. *Motions to Dismiss*

Following the first and second trials, Garcia moved to dismiss the case in the interest of justice, in reliance on Penal Code section 1385. Both motions were

denied, which Garcia contends was an abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 374.)

The first trial ended in a verdict of nine-to-three for acquittal. The trial court denied Garcia's first motion to dismiss based on the People's proffer of a new legal theory, i.e., that Chavez was an accomplice to the murder. The trial court believed that the new legal strategy would make "a different result very likely" on retrial. In response, Garcia argued that evidence was likely to be lost because the People might not be able to produce Chavez for a second trial. The trial court weighed those considerations in its decision to deny the motion and did not abuse its discretion.

The trial court denied Garcia's motion to dismiss after the second trial because of the seriousness of the offense combined with the jury's about-face: the jury deadlocked eight-to-four for conviction. The court reasoned that the People's new legal strategy likely accounted for its stronger showing in the second trial, increasing the likelihood that a third trial would lead to a verdict. The trial court weighed this consideration against the 33-year time lapse, the length of time Garcia had been in custody (18 months), and his poor health and diminishing financial resources. There was no abuse of discretion.

Contrary to Garcia's claim, the record does not show that the trial court based either of its rulings on improper consideration of jurors' deliberations.

### III. *Confrontation Clause*

Garcia contends that the trial court improperly permitted the introduction of Chavez's testimony from the first trial at the third trial because Chavez was not "unavailable" within the meaning of the confrontation clause of the United States and California Constitutions. Garcia also claims that Chavez's two police interviews were improperly admitted as prior consistent statements. Neither contention has merit.

### A. *Forfeiture By Wrongdoing*

The People contend that Garcia forfeited his right to complain about

10

Chavez's absence from the second trial by making death threats against Chavez and his family, thus preventing Chavez from testifying. This argument is meritless.

The forfeiture by wrongdoing rule applies where there is "substantial evidence" that the defendant "committed an act to prevent a witness from testifying." (*People v. Banos* (2009) 178 Cal.App.4th 483, 501.) The evidence of death threats came from Detective Real, who testified that Chavez told him he would not return for the second trial because he had received death threats and that his family lived in Guerrero, "which, according to [Chavez], had a lot of drug violence and kidnappings there." Detective Real did not testify that Chavez named Garcia as the source of the threats and the prosecutor did not press him to be more specific.

We will not infer, as the People urge, that Garcia was the source of the threats. Reasonable inferences from the evidence must be based on substantial evidence, not on "'suspicion, . . . speculation, supposition, surmise, or conjecture . . . .'" (*People v. Raley* (1992) 2 Cal.4th 870, 891.) "'If the existence of an essential fact upon which a party relies is left in doubt or uncertainty, the party upon whom the burden rests to establish that fact should suffer, and not his adversary.' [Citations.]" (*People v. Tatge* (1963) 219 Cal.App.2d 430, 436.) Whether the threats came from Garcia, as opposed to some other source, is an essential fact underlying the People's forfeiture by wrongdoing argument. Detective Real created uncertainty by not making it clear that Chavez identified Garcia as the source of the threats and by leaving open the possibility that the threats came from others in the apparently violent community where Chavez's family lived. The People's failure to clear up that uncertainty must be resolved in Garcia's favor. We reject the People's forfeiture by wrongdoing argument because it is based on conjecture, not substantial evidence.

B. *Reasonable Diligence*

Both federal and state law recognize an exception to the right of confrontation when the prosecution demonstrates both the witness's unavailability and the reliability of the previous testimony, as demonstrated when the party against whom the testimony is offered "'had the right and opportunity to cross-examine the

11

[witness] with an interest and motive similar to that which he has at the hearing.' [Citation.]" (*People v. Louis* (1986) 42 Cal.3d 969, 983; *Barber v. Page* (1968) 390 U.S. 719, 722.)

A witness who is absent from a trial is not "unavailable" within the meaning of the Sixth Amendment unless the prosecution has made a "'good faith effort'" to secure the witness's presence at the trial. (*People v. Herrera* (2010) 49 Cal.4th 613, 622.) California requires the proponent to have "'exercised reasonable diligence but has been unable to procure the witness's attendance . . . .'" (*Ibid.*; Evid. Code, § 240, subd. (a)(5).) Our Supreme Court has held that these standards are indistinguishable. (*Ibid.*) We independently review the trial court's determination that the prosecution exercised reasonable diligence. (*People v. Cromer* (2001) 24 Cal.4th 889, 901.) Relevant considerations "'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' [Citation.]" (*People v. Herrera*, *supra*, at p. 622.) After independent review, we agree with the trial court that the People met their burden.

Chavez returned to Mexico after the first trial, as both the People and Garcia knew he would. There is no evidence that the prosecuting attorney knew or should have known that Chavez would not return to testify at the second trial; in fact, she expected him to do so. Detective Real communicated with Chavez several times by telephone. Detective Real also had the address of Chavez's wife and son in Perris. In January 2010 Chavez told Detective Real for the first time that his family in Mexico was receiving death threats. Later, when Detective Real asked Chavez to return and testify at the second trial Chavez "adamantly" refused because of the death threats.

The second trial did not begin until August 31, 2010. Despite Chavez's insistence that he would not testify at the second trial, Detective Real kept in regular contact with Chavez's wife and son in Perris. He also conducted at least a dozen 2-day stakeouts at the Perris house between the first and second trials in an effort to

12

contact Chavez if he should return to his home. Officers ran criminal checks to determine if Chavez had picked up any new arrests in the United States and found none. They contacted the Department of Homeland Security, which advised that there was no record of Chavez re-entering the United States. Chavez was not located and his testimony from the first trial was read at the second trial, which ended in a mistrial on September 20, 2010.

The trial court granted the People's motion for a third trial, which began on September 21, 2011. Detective Real resumed his efforts to locate Chavez on May 9, 2011. United States Customs confirmed Chavez had not returned to the United States. Detective Real found no record of arrests in California. Chavez's family told Detective Real that Chavez had not come back, was not coming back and they had no contact information for him. Suspecting that Mrs. Chavez was not being fully honest with him, Detective Real again conducted multiple stakeouts of the Perris house.

The police began their search for Chavez promptly after both the first and second trials and were continuous in their efforts to locate him. Due diligence did not require additional efforts by the prosecution to produce Chavez for trial.

Garcia nevertheless argues that reasonable diligence required the People to go to greater lengths to keep Chavez from returning to Mexico after the first trial and, once he had left the country, to bring him back for the second and third trials. Neither of these arguments is persuasive.

*1. Efforts to Prevent Chavez from "Becoming Absent"*

Garcia contends that reasonable diligence required the People to take all available steps to prevent Chavez's return to Mexico because he was an essential witness whom the People knew to be a flight risk with an extensive criminal history and credibility problems. (*People v. Louis*, *supra*, 42 Cal.3d 969.) In *Louis*, the missing witness was vital to the prosecution's case -- he was the only witness who identified the defendant as the shooter. He was also "recognized by all" to be highly untrustworthy. (*Id.* at p. 989.) Yet the prosecution released him on his own

13

recognizance after the preliminary hearing; he promptly disappeared.  The Supreme Court held that the trial court improperly permitted the use of the witness's preliminary hearing testimony in these circumstances.  This case is distinguishable.  Chavez was not recognizably untrustworthy; he had testified at both the preliminary hearing and the first trial without threat of flight.  Although he was an important witness, he was not, like the witness in *Louis*, the only witness who could identify Garcia as the shooter; Barbara Ornellas, who testified at all three trials, also identified Garcia as the shooter.  Ballistics evidence tied him to the murder as well.  Chavez's history of arrests for drunk driving and manufacturing methamphetamine was not, as Garcia argues, a red flag of unreliability that required the People, in the exercise of reasonable diligence, to make all efforts to keep him from leaving the country.

Garcia also contends, in reliance on *People v. Roldan* (2012) 205 Cal.App.4th 969, that reasonable diligence required the People to take various other steps to keep Chavez from leaving the United States, such as (1) obtaining an undertaking for him to appear at trial (Pen. Code, § 1332), (2) holding him as a material witness until he entered into such an undertaking (*id.*, §§ 1335-1345) or (3) videotaping a conditional examination for use at the retrial (*ibid*).  All of these measures are available to the prosecution to secure the attendance of a key witness whom the prosecution believes will not voluntarily appear and testify.

Reasonable diligence did not require resort to such measures in Garcia's case.  In *Roldan*, as in *Louis*, the missing witness's testimony was the only evidence implicating Roldan as the shooter.  (*People v. Roldan*, *supra*, at p. 980.)  As explained above, Chavez's testimony was not the only evidence that tied Garcia to Roberto's murder.  Reasonable diligence did not require resort to such measures in Garcia's case.  Also, there is no evidence that the People knew at the time Chavez was returned to Mexico that he would not return to testify at the second trial.  He had voluntarily testified at the first trial and the People expected him to return for the second trial.  Only after Chavez had returned to Mexico did the People learn that he

14

was refusing to return to the United States because of death threats. *Roldan*, like *Louis*, is distinguishable.

Arguably, the People should have served Chavez with a subpoena to attend the second trial before he left for Mexico in December 2009. Their failure to do so, however, was not a failure to exercise reasonable diligence in light of the persistent efforts of the Baldwin Park Police to produce Chavez for the second and third trials and when hindsight demonstrates that Chavez would not have returned to the United States to testify in any event because of the death threats he and his family received after he was deported.

*2. Efforts to Obtain Chavez's Return From Mexico.*

Garcia also contends that reasonable diligence required the People to seek assistance under the Mutual Legal Cooperation Assistance Treaty of 1988 between the United States and Mexico (27 I.L.M. 443) to secure Chavez's presence at the second trial. (*People v. Sandoval* (2001) 87 Cal.App.4th 1425.) This argument is meritless because invocation of the treaty would have been futile. A request for assistance under the treaty must be accompanied by information concerning the whereabouts of the witness. (27 I.L.M., p. 448.) Because neither the Baldwin Park Police nor the prosecuting attorney had an address for Chavez in Mexico, any request for assistance would have been rejected. In addition, Articles 8 and 9 of the treaty are dependent on the *consent* of the witness.[6] Chavez adamantly refused to return to the United States because his life had been threatened. Reasonable diligence did not require the People to invoke the treaty because doing so would not have procured Chavez's presence at the second and third trials in any event.

"That additional efforts might have been made or other lines of inquiry

_____

[6] Article 8 of the treaty provides for the transportation to the United States of a person in custody in Mexico to testify if the person consents. (27 I.L.M., p. 449.) Article 9 allows the prosecution to request the assistance of Mexican authorities to invite a person in Mexico to come to the United States to testify and to inform the witness about the extent to which the witness's expenses will be paid. (*Ibid.*)

15

pursued" does not change our conclusion that the People exercised reasonable diligence to produce Chavez for trials two and three. "'It is enough that the People used reasonable efforts to locate the witness.' [Citation.]" (*People v. Valencia* (2008) 43 Cal.4th 268, 293.) The trial court did not err in determining that Chavez was unavailable as a witness.

## C. Reliability of the Prior Testimony

As explained above, the exception to the confrontation clause for an unavailable witness only applies if the defendant had "'the right and opportunity to cross-examine the [witness] with an interest and motive similar to that which he has at the hearing.' [Citation.]" (*People v. Louis*, *supra*, 42 Cal.3d at p. 983; *Barber v. Page*, *supra*, 390 U.S. 719 at p. 722.) In the cases Garcia relies on – *Louis*, *Roldan* and *Sandoval* – the prior testimony the prosecution sought to use was preliminary hearing testimony. A defendant's interest and motive for cross-examining a witness at a preliminary hearing may differ from those that guide cross-examination at trial. In *Louis*, for example, our Supreme Court observed that defense counsel at the preliminary hearing cross-examined the absent witness with an "interest and motive peculiar to that early stage in the proceedings – viz., to attempt to tie [the witness] down, in the interests of pretrial discovery . . . ." (*People v. Louis*, *supra*, at p. 983.) Here, the testimony of Chavez used at the third trial was his testimony from the first trial. Garcia does not argue that his interest and motive for cross-examining Chavez was any different at the third trial than at the first. The record indicates that Garcia's counsel aggressively cross-examined Chavez in the first trial, making extensive use of the transcripts of Chavez's two police interviews for impeachment, as explained more fully below. Because Chavez was properly found to be unavailable and his testimony from the first trial was reliable, the trial court did not err in permitting its reading.

## D. Admission of the Two Investigation Interviews as Prior Consistent Statements.

At Garcia's first trial, his counsel vigorously cross-examined Chavez using statements he made in two pretrial interviews, one with police and one with

police and a deputy district attorney.  Garcia's counsel repeatedly called attention to discrepancies between Chavez's trial testimony and the earlier statements.  He also implied, by his closing question, that Chavez was testifying differently at trial because the People had offered him immunity in exchange for favorable trial testimony.  At the third trial, following the reading of Chavez's testimony from the first trial, the People asked that the transcripts of the interviews be read to the jury as prior consistent statements.  The trial court granted the motion and permitted the jury to hear both interviews.  Garcia contends that the interviews should have been received only for impeachment, if at all.[7]  His argument is meritless.

Evidence Code section 1236 permits the admission of a prior consistent statement as substantive evidence if the statement is offered in compliance with Evidence Code section 791.  Evidence Code section 791, subdivision (b) permits the admission of a prior consistent statement when the opponent expressly or impliedly claims that the witness's testimony at the hearing is recently fabricated and the prior statement was made before the motive to be untruthful arose.  Because Garcia's counsel implied that a promise of immunity made after the police interviews motivated Chavez to lie at trial, Evidence Code section 791 permitted the use of the interviews as substantive evidence.  (See Cal. Law Revision Com. com. to Evid. Code, § 1236.)

*IV.  Hearsay Issues*

*A.  Hearsay Testimony of Norberto Lozano and Herminio Zendejas Received as Past Recollection Recorded.*

Shortly after the murder, Detective Lanza of the Baldwin Park Police interviewed Norberto Lozano (Norberto) and Herminio Zendejas.  Both gave statements to Detective Lanza, which he included in a written report.  Both statements said that Garcia and another man were visiting from the Fresno area on

---

[7] Garcia's argument that the interviews should not have been received at all because the trial court improperly permitted Chavez's testimony from the first trial to be read at the third trial is disposed of in section III, subsection B., *ante*.

17

September 8, 1976, and spent the night at Zendejas's house. Garcia was driving his green Pontiac.

At the time of the third trial, September 20, 2010, neither Norberto nor Zendejas recalled having given a statement to the police in September 1976, although Norberto testified that, if he had given a statement, he would have been "100 percent" truthful. When the People were unable to refresh the witnesses's recollections with Detective Lanza's statements, the trial court allowed Detective Lanza's statements as past recollection recorded.

We review evidentiary rulings, including those involving hearsay issues, for abuse of discretion. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1144.) Garcia contends that the trial court abused its discretion by admitting Norberto's and Zendejas's statements. We agree. In the case of Norberto's statement, however, Garcia waived the right to appeal that error because he did not make the objection in the trial court. (*People v. Mickey* (1991) 54 Cal.3d 612, 689.) Garcia also waived his claim that admission of the statements violated his state and federal due process rights. (*People v. Sanders* (1995) 11 Cal.4th 475, 510, fn. 3.) In any event, the errors were harmless.

As a substantive matter, the trial court erroneously admitted the statements as past recollection recorded. The statements were hearsay, offered to prove the truth of the matter stated, i.e., that Garcia was in Baldwin Park on September 9, 1976. Neither witness testified that "the statement [contained in the writing] was a true statement of such fact," as required by Evidence Code Section 1237, subdivision (a)(3). Because neither witness recalled making a statement to the police 35 years earlier, neither could competently testify that the statement written then was true. Nor was there any evidence that either witness was deliberately evasive or that their asserted memory lapses were untrue. (*People v. Parks* (1971) 4 Cal.3d 955, 960.) Norberto's testimony that, if he had given a statement, he would have been truthful, did not amount to testimony that the statement in the writing was in fact true, as the statute requires.

18

Nor were the statements properly received as business records, as the People urge. The business records exception "'does not make [a] record admissible when oral testimony of the same facts would be inadmissible.'" (*Behr v. County of Santa Cruz* (1959) 172 Cal.App.2d 697, 705.) Had Detective Lanza attempted to testify as to what either Norberto or Zendejas told him, his testimony would have been excluded as hearsay. His written statement did not salvage the testimony.

These errors were harmless. Before a conviction can be reversed based upon the erroneous admission of evidence in a criminal prosecution, we must conclude that it is reasonably probable that, in the absence of the erroneously admitted evidence, a result more favorable to the defendant would have been reached. (*People v. Champion* (1995) 9 Cal.4th 879, 923.) The substance of both Norberto's and Zendejas's statements was that the two witnesses saw Garcia in Baldwin Park on the day of the homicide. Although part of Garcia's defense was that he was not in Baldwin Park that day, the statements of Norberto and Zendejas only indirectly corroborated the more probative testimony of Chavez and Barbara Ornellas that they saw Garcia at the actual scene of the crime. We cannot conclude that the jury would have reached a different result if the statements had been excluded. (*People v. Sanders*, *supra*, 11 Cal.4th at p. 510, fn. 3.) The harmlessness of the error also defeats Garcia's claims that the trial court's erroneous ruling deprived him of a fair trial under federal and state due process (*People v. Partida* (2005) 37 Cal.4th 428, 436) (which claims were waived in any event, as discussed above), and that his counsel's failure to object to the admission of the evidence on due process grounds deprived him of effective assistance of counsel. (*People v. Waidla* (2000) 22 Cal.4th 690, 718.)

*B. Hearsay Statements About the Location of Appellant's Car*

Rafael Ramos Lozano (Rafael) testified for the People. On direct examination he was asked: "At some point did you have a conversation with Mr. Zavala about the green Pontiac after your cousin was murdered?" Rafael answered, "No." The prosecutor then asked: "Do you recall telling Detectives Harvey and Real

that Rudolfo Zavala told you that the defendant called him a couple of days after the murder and told him where he could pick up the car?"  Rafael responded, "Yes."  The trial court permitted Rafael to testify about these conversations over Garcia's hearsay objection.

The trial court also admitted a police report made by Detective Lanza on September 20, 1976, that set forth the following events:  Detective Lanza received a phone call from Zavala; Zavala said he received a call from Abdon Bustos approximately one week after the murder in which Bustos told Zavala that Garcia's car was parked on the United States side of the border near Tijuana and that Zavala could pick it up.  Zavala also stated that Bustos told him that Garcia had telephoned him "possibly from [Tijuana]."  The trial court received Detective Lanza's report over Garcia's hearsay objection.

### 1.  Zavala Statement

"[M]ultiple hearsay is admissible for its truth only if each hearsay layer separately meets the requirements of a hearsay exception.'  [Citation.]"  (*People v. Arias* (1996) 13 Cal.4th 92, 149.)  Garcia's statement to Zavala – the first level of hearsay – meets the exception for a party statement.  (Evid. Code, § 1220.)  Zavala's statement to Rafael about the location of the car, however, is not subject to any hearsay exception.  Evidence Code section 770 only excepts a statement "by a *witness* that is inconsistent with any part of his testimony at the hearing."  Zavala's statement to Rafael was not a prior statement of the witness, Rafael.  Because the People offer no other exception for Zavala's hearsay statement, admission of the multiple levels of hearsay was error.

### 2.  Hearsay Statements of Abdon Bustos Admitted Through Detective Lanza's Report.

The trial court found that the hearsay statements from Bustos to Zavala and from Zavala to Detective Lanza, both of which were contained in Detective Lanza's police report, were prior inconsistent statements.  Both findings were error.

Bustos's statement to Zavala was inadmissible as a prior inconsistent

20

statement because Bustos did not testify at the trial. Evidence Code section 1235 permits admission of inconsistent statements made by a witness who actually testifies at the hearing. (*People v. Williams* (1976) 16 Cal.3d 663, 669.) Because Bustos did not testify at trial, the exception does not apply to him. Turning to Zavala's statement conveying Bustos's statement to Detective Lanza, the trial court found that Zavala's statement was inconsistent with a statement of Zavala that he did not know Bustos. Zavala did so testify. Zavala's prior statement that he did not know Bustos, however, is not sufficiently inconsistent with his statements that (1) Bustos told him where to find the car and (2) Garcia had called Bustos "possibly from [Tijuana]" to justify the admission of the latter statements as prior inconsistent statements. Finally, Detective Lanza's report was not admissible as a business record, as explained in section IV, subsection A., *ante*. (*Behr v. County of Santa Cruz, supra*, 172 Cal.App.2d at p. 705.)

Although the hearsay statements were improperly admitted, the errors were harmless and did not deprive Garcia of either his constitutional due process rights or effective assistance of counsel under the standards set forth in section IV., subsection A., above. Other evidence tied Garcia to the green Pontiac left at the border. Zavala testified that he cosigned for Garcia when Garcia purchased the green Pontiac. Chavez also identified Garcia's green Pontiac and testified that he drove it to San Ysidro on Garcia's orders. Chavez also testified that Garcia told him to leave the green Pontiac in San Ysidro before they crossed over into Mexico. It is not reasonably probable the verdict would have been more favorable to Garcia absent the trial court's errors in admitting the hearsay statements of Zavala and Bustos.]]

*V. Sentencing Errors*

Garcia asserts, and the People acknowledge, that the trial court made three sentencing errors. We agree and modify those errors as shown below.

*DISPOSITION*

(1) The $200 parole revocation fee is stricken; (2) the sentence of life without the possibility of parole is amended to life in prison to reflect the oral

21

pronouncement of sentence (*People v. Mitchell* (2001) 26 Cal.4th 181, 185); and (3) Garcia's custody credits are amended to 897 days, including the date of arrest and the date of sentencing.

We direct the superior court to prepare an amended abstract of judgment accordingly, and to send a certified copy to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

<u>CERTIFIED FOR PARTIAL PUBLICATON.</u>

O'DONNELL, J.[*]

We concur:

YEGAN, Acting P. J.

PERREN, J.

---

[*] Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article 6, section 6 of the California Constitution.

22

Mike Camacho, Judge

Superior Court County of Los Angeles

_____

Donald R. Tickle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Rama R. Maline, Deputy Attorney General, for Plaintiff and Respondent.